COMMONWEALTH *vs.* LEO J. KLECIAK.

Hampden.     March 7, 1966. — May 4, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Evidence,* Admissions and confessions, Impeachment of witness, Relevancy and materiality, Offer of proof, Evidence of insanity. *Constitutional Law,* Self-incrimination, Assistance of counsel. *Practice, Criminal,* Assistance of counsel, Charge to jury. *Witness,* Impeachment. *Homicide.*

An oral confession made by the defendant in a murder case during an interrogation at a police station in the absence of his counsel was not inadmissible at the trial of the case on the ground that police officers had not specifically advised him of his right to remain silent where it appeared that he had conferred with his attorney shortly after his apprehension and about two hours before the interrogation and was given "some advice" by his attorney and told "what to do" and "not to say a word," and that a police lieutenant had twice warned the defendant that what he said could be used against him.  [685]

Where it appeared that prior to the commencement of any proceedings in a murder case the defendant was apprehended and was twice told by a lieutenant of the State police that the defendant could "call his attorney" and that what the defendant said could be used against him, that at the State police barracks the lieutenant dialed the telephone number of the defendant's attorney and the attorney gave the defendant "some advice" and told him "what to do" and "not to say a word," that the attorney did not meet the police and the defendant as expected at a city police station to which the defendant was then taken, that at no time did any police attempt to prevent the defendant from seeing his attorney, and that during a three hour interrogation of the defendant at the police station commencing about two hours after his telephone conversation the police made no threats or promises to him and did not ask him any questions requiring a knowledge of the law to answer, it was held that in the circumstances an oral confession made by the defendant during the interrogation was not inadmissible at the trial of the case as having been made in the absence of his attorney.  [686–689]

The rule established by *Commonwealth* v. *Tolliver,* 119 Mass. 312, that an involuntary confession may be admitted in evidence in a criminal case to impeach the defendant's credibility, would not be followed.  [689–690]

At the trial of a criminal case in which the judge after a voir dire ruled that statements made by the defendant at a police station and contained in an unsigned document "were made voluntarily," but excluded the document "as an exhibit in its written form" because the statements in its first paragraph were not made by the defendant and admitted

testimony of a police officer as to what the defendant had told him "as it . . . appear[ed] in" the rest of the document, there was no error in permitting cross-examination of the defendant with respect to such statements made by him.   [690]

There was no error prejudicial to a defendant at his trial for the murder of his wife in permitting cross-examination of him with respect to written statements allegedly made by his sons which he admitted to be true.   [690–691]

At the trial of a defendant for the murder of his wife, there was no error in the exclusion of questions to a doctor designed to show that the deceased was in a suicidal state of mind where there was no evidence that she had committed suicide.   [691]

Considering in its entirety the charge of the judge at a murder trial, there was no merit in a contention of the defendant that a part of the charge dealing with credibility implied that the defendant had lied.   [692]

At the trial of the defendant for the murder of his wife, the defendant was not harmed by the exclusion of a question to his son as to whether the defendant had seemed "confused" during a period several months prior to the murder where the question did not establish the cause of confusion and the witness testified that immediately after the murder the defendant "was all mixed up and he didn't make too much sense."   [692–693]

There was nothing in the record of a murder case to show that there was error on the part of the trial judge in excluding questions to the defendant the answers to which allegedly would show that he was suffering from delusions and was not responsible for his acts, where he made no offer of proof.   [693]

At a murder trial in which there was evidence that the defendant shot his wife and then threatened to commit suicide, there was no error in the exclusion on cross-examination of a psychiatrist of a question concerning insanity where the defendant made no offer of proof and it did not appear that an answer to the question would be helpful.   [694]

The record of the trial of a defendant for the murder of his wife revealed that a verdict of guilty of murder in the first degree was fully supported by the evidence, and there was no error in the denial of the defendant's motions for directed verdicts of not guilty of murder in the first and second degrees, and upon a review under G. L. c. 278, § 33E, as amended by St. 1962, c. 453, justice did not require ordering a new trial or the entry of a verdict of a lesser degree of guilt.   [694]

INDICTMENT found and returned on September 18, 1964.

The case was tried in the Superior Court before *Macaulay,* J.

*Efrem A. Gordon* for the defendant.

*Leonard E. Gibbons,* Assistant District Attorney (*Matthew J. Ryan, Jr.,* District Attorney, with him), for the Commonwealth.

SPIEGEL, J.   The defendant was tried on an indictment which charged that on June 3, 1964, he "did assault and beat, one Stella Kleciak, with intent to murder her, by shooting her, and by such assault, beating and shooting, did murder the said Stella Kleciak." The jury returned a verdict of guilty of murder in the first degree with a recommendation that the sentence of death be not imposed.   The case was tried subject to G. L. c. 278, §§ 33A–33G, and is here by appeal.   The defendant filed thirty-one assignments of error but in his brief expressly waived fourteen of the assignments.   Three other assignments of error were not argued in his brief and are deemed waived.   *Commonwealth* v. *Taylor,* 327 Mass. 641, 646.   *Commonwealth* v. *Griffin,* 345 Mass. 283, 284.

A truck driver testified that, while waiting in the cab of his truck for a loading platform to be opened, he saw a woman running in front of his truck "yelling for help" and "[s]omething about a gun."   "Then she start [*sic*] running again" and he saw "[s]ome man with a gun who was right behind her, chasing her."   He then got out of the truck on the opposite side and as he was "getting out of the truck" he heard four or five shots.   Subsequently, in a "lineup" at the police station in Springfield he identified the defendant as the man with the gun.

Frederick, the defendant's son, testified that his father came home on June 3, 1964, and told him that his mother was dead, that "she was shot all over."   The defendant was holding a gun in his hand.   Frederick took the gun, unloaded it, and put it in the dresser drawer.   Later that morning the defendant "found it again" and "headed towards the woods" to commit suicide.   Frederick followed him into the woods and the defendant there "handed it" back to him.   They returned to the house and the defendant said "[h]e wanted to go to the Holyoke Police to give himself up."

Another of the defendant's sons, Edward, testified that when his father came home that day he "told us what he did."   Edward asked the defendant "[w]here did you shoot her," and the defendant pointed to his chest.   He

had a gun which Edward took from him and gave to Frederick to hide. The defendant found the gun and walked toward the woods. "He said he was going to shoot himself." The defendant gave the gun to Frederick, and Edward then went to call the police.

The Commonwealth attempted to introduce in evidence several statements made by the defendant to State police Lieutenant Keeley. Upon objection by the defendant the trial judge held a voir dire hearing on the admissibility of the statements.

At this hearing there was evidence by the Commonwealth that the defendant was apprehended by the State police at about 3 p.m. on June 5, 1964. After spelling his name for State police Lieutenant Keeley, and "without any more questions" from him, the defendant said, "Oh, my God, I didn't want to do it this way. I wanted to go in and give myself up."[1] On the way to the State police barracks, in response to questions asked by the lieutenant, the defendant said that he did not know how many times he shot his wife; that after he shot her he went home and told his son, "Mommy is dead"; that he "was going to call up the police but the boy pulled the phone out." At the conclusion of the voir dire, the defendant withdrew his objection to the admission of his statements to the lieutenant.

The trial was then resumed and the lieutenant testified to the statements made to him by the defendant. The Commonwealth then attempted to introduce in evidence statements of the defendant to the Holyoke police. The defendant objected, and a second voir dire was held. At this hearing there was evidence that as the lieutenant and the defendant approached the barracks, the lieutenant told the defendant "that he had an opportunity to call his attorney and that anything could be used against him." At the barracks, the lieutenant "told him of his rights and that he could call his attorney . . . [and] told him anything he said could be used against him." But the lieutenant did not

---

[1] State police Lieutenant Keeley testified at a second voir dire hearing that when he first spoke with the defendant, "It was my understanding then that he was under process of investigation and . . . I knew he was a suspect, not a chief suspect, or anything else. He was a suspect."

Commonwealth *v.* Kleciak.

"tell him specifically he had a right not to say anything."

After so advising the defendant, the lieutenant dialed the number of the defendant's attorney and handed the telephone to the defendant, who talked to his lawyer. The defendant testified that the lawyer gave him "some advice," told him "what to do" and advised him "not to say a word." The defendant said to the Holyoke police that "my lawyer was supposed to meet me in Holyoke between 5:00 and 5:30, and on his advice I was to wait for him there."

The Holyoke police brought the defendant to the Holyoke police station at about 5:00 or 5:30 P.M. The defendant's lawyer was not there at that time. The police took the defendant into the interrogation room where they questioned him for about three hours. During the interrogation, the police made no threats or promises to the defendant. They brought him a glass of water when he requested it. The defendant "did say that he was tired." The defendant testified that he kept asking for his lawyer throughout the questioning. A police officer stated that the defendant did not ask for a lawyer until he was asked to sign a statement at the end of the interrogation, but another officer said that "[o]n two or three occasions" during the questioning the defendant did ask to see his lawyer. Although the defendant asked to see his lawyer, the defendant made no objection to being questioned.

At the conclusion of the questioning, Sergeant Hennigan read a statement to the defendant. This was not a verbatim transcript of the questions and answers, some of which were not included. The police had composed the first paragraph of the statement which read as follows: "I, Leo Kleciak, of my own free will and accord, make the following statement voluntarily, without force, fear, promises, or bribes exercised by the police, and it is the truth, so help me God." When asked to sign the statement, the defendant said, "I do not want to sign this statement until I see my lawyer." The defendant was then booked, at which time his lawyer was present. The lawyer made no inquiry of the officer at that time.

After the second voir dire, the judge found that the defendant "was advised by the police of his rights to use the telephone and his rights to engage the services of a lawyer and in fact, that he did so." The judge also found "that he received the advice of his lawyer . . . and in this case there was no evidence that the police in any [way] prevented the lawyer from seeing the defendant during the interrogation, if the lawyer had come to the Police Station." The judge ruled "that the statements . . . were made voluntarily by the defendant without threats or duress or promises or inducements or hope of favor or reward. . . . [T]hat such testimony . . . presented at the voir dire was believable evidence outweighing beyond a reasonable doubt the evidence offered by the defendant."

The judge then stated, "I will not admit . . . [the defendant's statements] as an exhibit in its written form, because I find on the testimony given in the voir dire hearing that the defendant did not say what appears in the first paragraph of the document. But I will admit oral testimony of Sergeant Hennigan of what the defendant told him at the Holyoke Police Station that evening as it relates or appears in the remaining portions [of the written statement]."

When the trial was resumed, Sergeant Hennigan testified that when statements by the defendant's sons were read to the defendant, "he said, 'If my boy said that, it must have been the truth.'" When the defendant was asked to sign the written statement, he said "It's the truth," and then stated, "I won't sign it. That's on the advice of my lawyer."[2] The sergeant also testified that the defendant said, "Sure I shot her. She's dead isn't she?" The sergeant stated that "[a] lot of this information he [the defendant] said without asking questions," and that "[s]ome of the questions I asked him, some of the statements [were] made voluntarily."[3]

---

[2] Sergeant O'Shea of the Holyoke police testified that "[a]t another point Sergeant Hennigan said, 'Well, all we want from you, Leo, is the truth.' He says 'Well you have it. I done it.'"

[3] In context we think the latter statement referred to the defendant's volunteering information without being asked specific questions.

The trial judge, in charging the jury with respect to the statements of the defendant testified to by the police, said in part, ''It is your duty, uninfluenced by the ruling of the Court that they were voluntary, to determine whether they were or were not voluntarily made. . . . [I]f you find they were not voluntarily made, you cannot use them as confessions.''

Assignments 8, 9 and 25 relate to the admission in evidence of the oral statements made by the defendant at the Holyoke police station. The defendant contends that these statements were inadmissible because the police did not advise him that he had a right to remain silent.

The Fifth Amendment states in part that ''No person . . . shall be *compelled* in any criminal case to be a witness against himself'' (emphasis supplied). The express language of the privilege does not prohibit self-incriminating statements, but it protects the individual from being compelled to incriminate himself. ''The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement — the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.'' *Malloy* v. *Hogan,* 378 U. S. 1, 8. The failure of the police to give a suspect an official warning of his right to silence is a factor in determining whether a suspect's statement was made ''in the unfettered exercise of his own will.''[4] It seems to us, however, that the lack of such a specific warning is offset by a showing that the defendant was informed of this right by his lawyer shortly before being questioned. See *Commonwealth* v. *Sousa, ante,* 591, 598. In the instant case, the defendant had conferred with his lawyer less than two hours before he was interrogated. In addition, Lieutenant Keeley twice warned the defendant that what he said could be used against him. We are of opinion that the defendant was, therefore, adequately informed of his right.

[4] ''The uncounseled suspect subjected to police questioning in a hostile atmosphere is likely to believe that there is an obligation to respond, even in the absence of coercive conduct by the police.'' Note, Developments in the Law — Confessions, 79 Harv. L. Rev. 938, 981.

Commonwealth *v.* Kleciak.

The defendant also maintains that his statements were inadmissible because they were obtained in the absence of counsel after he had asked to see counsel.  He argues that he was denied his rights under the Sixth Amendment which reads in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The defendant relies on the cases of *Massiah* v. *United States,* 377 U. S. 201, and *Escobedo* v. *Illinois,* 378 U. S. 478, to support this contention.

In *Massiah* v. *United States, supra,* the petitioner was indicted for violating the Federal narcotics laws.  "While he was free on bail a federal agent succeeded by surreptitious means in listening to incriminating statements made by him." *Massiah* v. *United States, supra,* at 201.  The court held that the petitioner was denied the basic protections of the Sixth Amendment "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him *after he had been indicted* and in the absence of his counsel" (emphasis supplied).  *Massiah* v. *United States, supra,* at 206.  The court went on to say: "All that we hold is that the defendant's own incriminating statements, obtained by federal agents *under the circumstances here disclosed,* could not constitutionally be used by the prosecution as evidence against *him* at his trial" (emphasis supplied).  *Massiah* v. *United States, supra,* at 207.

Two factors distinguish the instant case from *Massiah* v. *United States, supra.*  First, as the trial judge pointed out, unlike the *Massiah* case, here no "meaningful judicial proceedings by way of indictment, criminal complaint, information or arraignment" had been instituted prior to the interrogation.

Second, in *Massiah* the petitioner did not know that he was being interrogated, and, therefore, was unaware that the advice given him by counsel was applicable.  In the instant case, the interrogation was conducted by police officers only a short time after the defendant had received the advice of his counsel.  Consequently, unlike Massiah, the defendant in the instant case had received the "Assistance

of Counsel'' with reference to his conduct during the interrogation.

In *Escobedo* v. *Illinois, supra,* the petitioner was arrested for the murder of his brother-in-law. He was released almost fifteen hours later on a writ of habeas corpus obtained by his lawyer. He was arrested again ten days later. During the interrogation, after the second arrest, the petitioner repeatedly asked to see his attorney; and his attorney went to the station and made repeated attempts to see his client. The police, however, refused to give the petitioner and his lawyer any opportunity to consult. In the course of the interrogation, the petitioner was informed that one DiGerlando had named him as the one who fired the shot. ''Without informing him of his absolute right to remain silent in the face of this accusation, the police urged him to make a statement.'' *Escobedo* v. *Illinois, supra,* at 485. The petitioner denied the accusation and said that DiGerlando had done the shooting. ''In this way, petitioner, for the first time, admitted to some knowledge of the crime. After that he made additional statements further implicating himself in the murder plot.'' *Escobedo* v. *Illinois, supra,* at 483.

The court said, ''Petitioner, a layman, was undoubtedly unaware that under Illinois law an admission of 'mere' complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots. *Illinois* v. *Escobedo,* 28 Ill. 2d 41. . . . The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation. *Powell* v. *Alabama,* 287 U. S. 45, 69.'' *Escobedo* v. *Illinois, supra,* at 486. The court then held ''that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and *been denied* an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Coun-

sel' in violation of the Sixth Amendment to the Constitution'' (emphasis supplied). *Escobedo* v. *Illinois, supra,* at 490–491. The court went on to say, ''We hold only that when the process shifts from investigatory to accusatory — when its focus is on the accused and its purpose is to elicit a confession — our adversary system begins to operate, and, *under the circumstances here,* the accused must be permitted to consult with his lawyer'' (emphasis supplied). *Escobedo* v. *Illinois, supra,* at 492.

The ''circumstances'' in the instant case are quite different from those involved in *Escobedo* v. *Illinois, supra.* First, here not only was the accused ''permitted to consult with his lawyer,'' but the police coöperated with the defendant to the extent that they dialed the number of his lawyer so that the defendant might consult with him over the telephone. The police at no time made any attempt to prevent the defendant from seeing his lawyer. The evidence shows that the police expected counsel to be waiting at the station when they arrived, and it was the delay of counsel in coming to the station that prevented the defendant from seeing him. Nothing in *Escobedo* v. *Illinois, supra,* requires the police to suspend questioning in this situation.[5] As the trial judge stated, ''Suspension of a criminal investigation until a lawyer for the person interrogated appears . . . would impede . . . the administration and enforcement of the criminal law.''

Second, in *Escobedo* v. *Illinois, supra,* the failure of the police to warn the defendant of his absolute constitutional right to remain silent took on special significance because, as noted in footnote 5 of the majority opinion, ''there is no evidence that . . . [the petitioner and his lawyer] discussed what petitioner should, or could, do in the face of a false accusation that he had fired the fatal bullets.'' *Escobedo* v. *Illinois, supra,* at 485. Here, however, the defendant's lawyer gave the defendant ''some advice,'' told him

[5] American Law Institute, A Model Code of Pre-Arraignment Procedure (Tent. draft No. 1), § 5.07 and Commentary, presently under consideration by the members of the American Law Institute, would permit interrogation at a preliminary screening during the period between the call to the lawyer and the lawyer's arrival.

"what to do," and "not to say a word," less than two hours prior to the interrogation. The defendant was not asked questions during the interrogation which would require a knowledge of the law to determine whether he should answer them. Unlike Escobedo, the defendant here received "the Assistance of Counsel" regarding his conduct during the interrogation.

We are of opinion that the constitutional rights of the defendant were protected and that the police questioning was within proper bounds even though the defendant was not specifically informed of his right to remain silent. See *Commonwealth* v. *Sousa, ante,* 591, 598–599.

Assignment 13 states that "[i]t was error for the Court to permit cross-examination of the Defendant with respect to a portion of a certain written statement which the Court had previously ruled to have been inadmissible," i.e., the statement typed by the Holyoke police.[6]

In his brief, the defendant urges us to overrule *Commonwealth* v. *Tolliver,* 119 Mass. 312, and cites many authorities in support of the rule that an involuntary confession may not be used on cross-examination to impeach the defendant. The issue in this case regarding the use of an inadmissible written confession is plainly distinguishable from the facts in the *Tolliver* case. Here, the judge ruled that although the written confession was inadmissible for the reason hereinabove referred to, the confession was a voluntary one and therefore oral testimony regarding portions of its contents was admissible. Nevertheless, the issue appears to be fully argued in the briefs, and we are aware of its importance in the administration of justice and the likelihood of the question arising in future cases. We think, therefore, that we should state our views so as to eliminate uncertainty and confusion. See *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731.

This court in *Commonwealth* v. *Tolliver,* 119 Mass. 312, 315, allowed the use of an involuntary confession for the

---

[6] Although this assignment of error cites two exceptions to cross-examination of the defendant the transcript reveals that these are to questions asked concerning statements made by his sons.

Commonwealth *v.* Kleciak.

purpose of impeachment. However, the overwhelming majority of other jurisdictions have rejected this rule.[7] A basis for the majority rule was stated in *Harrold* v. *Territory of Oklahoma,* 169 Fed. 47, 50 (8th Cir): "The privilege granted to an accused person of testifying on his own behalf would be a poor and useless one indeed if he could exercise it only on condition that every incompetent confession induced by the promises, or wrung from him by the unlawful secret inquisitions and criminating suggestions, of arresting or holding officers, should become evidence against him." We believe that an involuntary confession does not become any more trustworthy, nor do the methods used to procure it obtain greater standing, because the confession is used to impeach the credibility of the defendant rather than as substantive evidence. Therefore, we would not follow the confession rule established by the *Tolliver* case.

The defendant argues that once a "statement is ruled inadmissible, it becomes immaterial, and may not be used in cross-examination." We note that when the written statement which the court had ruled inadmissible "as an exhibit" was used on cross-examination, the defendant failed to take an exception. Even if a proper exception had been taken, it would not have affected the result. The judge found that "the statements made by the defendant, as set forth in . . . [the written statement] except the first paragraph thereof, were made voluntarily . . . ." He also admitted "oral testimony of Sergeant Hennigan of what the defendant told him at the Holyoke Police Station that evening as it relates or *appears in* the remaining portions [excluding the first paragraph of the written statement]" (emphasis supplied). Although the written statement could not be admitted as an exhibit because of its first paragraph, there was no error in permitting the remaining portions to be used on cross-examination.

The exceptions to cross-examination of the defendant concerning written statements allegedly made by his sons which he admitted to be true (see footnote 6 regarding as-

[7] We find only two States, Alabama and Montana, which have clearly adopted the rule we established in *Commonwealth* v. *Tolliver,* 119 Mass. 312.

signment 13) were not argued, and therefore we need not
consider them. *Commonwealth* v. *Taylor,* 327 Mass. 641,
646. *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 277.
Nevertheless, this being a capital case we think it advisable
to discuss them.

When an accused makes an evasive or equivocal reply to
a statement which incriminates him and which he heard and
understood, both the statement and his answer are admissible. *Commonwealth* v. *Lucas,* 332 Mass. 594, 597. *Commonwealth* v. *Machado,* 339 Mass. 713, 715–716. The Commonwealth did not show that the statements read in court
were the same as the statements of the defendant's sons
read to him at the station. However, the sons' testimony,
as summarized above, was substantially the same as the
statements which the Commonwealth read. With regard to
the statements read in court, we quote from the cross-
examination of the defendant: Q. "But you know these
statements here are true that your sons have given to
the police?" A. "Oh, yes." Q. "And which I just
read to you?" A. "Yes." Q. "Those are the truth?"
A. "Yes." Q. "And that's a fair and honest presenta-
tion — " A. "Oh, yes." Q. " — what took place in
your house on June 3, 1964?" A. "Yes." In the light
of the foregoing we are satisfied that there was no prejudi-
cial error.

Assignments 15 and 30 are based on the exclusion of
questions designed to show that the deceased was suicidal
and to the refusal of the trial judge to charge on the possi-
bility of suicide.

The doctor of whom the questions were asked stated that
he did not observe the deceased sufficiently to be competent
to make a definite diagnosis, and that he did not "make a
tentative or temporary opinion" as to her condition. Thus,
the exclusion of the questions asked him in no way preju-
diced the defendant. In any event, the mental state of the
deceased was irrelevant since there was no evidence that
she committed suicide. The judge was not required to
charge on a hypothesis which was not supported by evi-
dence. *Commonwealth* v. *McCann,* 97 Mass. 580, 582.

*Commonwealth* v. *Levenson,* 250 Mass. 440, 444–445. *Commonwealth* v. *Dawn,* 302 Mass. 255, 262.

Assignment 22 has to do with a portion of the judge's charge in which he stated, "Now, in the course of this trial, evidence was introduced that one or more witnesses who testified before you were alleged to have said something different to the State Police or the Holyoke Police or others at some prior time or times, or on some prior occasions from what they testified here in Court." The defendant claims that the instructions implied that the defendant lied inasmuch as he was the only witness who spoke to both the State police and the Holyoke police.

The portion of the charge objected to was part of a general charge on credibility. The judge clearly stated that it was only "*alleged*" that inconsistent statements were made, and he also said, "*if* a person is shown to have made statements different from what he testified in Court, . . . you *may* draw an inference that he is untruthful . . . but you may infer, if you find it fair to do so, that his memory was faulty . . ." (emphasis supplied). Thus, the judge left it to the jury to decide whether previous statements were made, whether they were inconsistent, and what weight should be given to the testimony. Considering the charge in its entirety we find nothing to sustain the defendant's view. See *Commonwealth* v. *Shea,* 323 Mass. 406, 416; *Commonwealth* v. *Aronson,* 330 Mass. 453, 457.

Assignment 10 challenges the exclusion of the following question asked of the defendant's son: "Sometimes, when he [the defendant] was talking to you about your mother, . . . did he seem confused?" The witness made a partial answer, "Well, he was drinking," before the objection was sustained. The defendant contends that the question should have been allowed to show that the defendant was insane at the time of the shooting. The question excluded referred to a period several months prior to the date of the shooting, and did not distinguish whether the cause of confusion was the defendant's mental state or his drinking. The witness was permitted to testify that immediately after the shooting, the defendant "was all mixed up and he didn't

make too much sense.'' In view of this testimony, we cannot see how the defendant was harmed by the refusal to admit the conclusion of the witness that several months prior to the shooting the defendant was ''confused.''

Assignments 11 and 12 are based on the exclusion of questions ''as to who, . . . [the defendant] imagined, had helped his wife to leave him in February of 1963 and what certain women . . . had done to cause the death of his wife.'' The defendant contends that his answers would have shown that he was suffering from delusions and was not responsible for his acts. However, he made no offer of proof; thus, there is nothing in the record to show that there was error in excluding the questions. *Commonwealth* v. *Perry,* 254 Mass. 520, 529. *Commonwealth* v. *Pelletier,* 264 Mass. 221, 225. *Commonwealth* v. *Farrell,* 322 Mass. 606, 623. *Commonwealth* v. *Baker,* 348 Mass. 60, 63–64. We note that the judge gave the defendant considerable latitude in the introduction of evidence concerning the defendant's sanity. There was extensive testimony by the defendant as to the alleged actions of his neighbors in helping his wife to leave him.[8] A psychiatrist testified that the defendant ''felt that her [his wife's] departure from her home was plotted and planned . . . by some neighbors . . .; that they had some kind of political influence in the city.'' He also testified that ''The circumstances in which . . . [the defendant] describes this particular overwhelming kind of a control the Monahans exercised on him, mentioning their political connections, their connections with the Holyoke paper and their connections with politicians — you know — dramatizes his situation to such an extent that one would suspect that it is delusional.''

Assignments 16 and 18 refer to the exclusion of questions in the cross-examination of two psychiatrists. The first psychiatrist was asked: ''And I wonder if you would ex-

---

[8] The defendant said, ''3 weeks my wife was planning there, in the Monahans, what to do and the Monahans took up from there.'' He also testified, ''I tried to go to the Monahans. I went to him [*sic*] four times. After that I was told by the Chicopee Police they will put me in jail. The Monahans done their job and I couldn't move forwards or backwards. They knew everything and they waited.''

plain to the jury what the basis for determining that a person who is about to kill himself does not know right from wrong. How would you make such a determination?" After excluding the question the judge reversed his ruling and allowed him to answer. The second psychiatrist was asked, "Now, I wonder if you would be kind enough to explain to us the kind of circumstances that you, as a psychiatrist, would recognize where a person would be suicidal and not know right from wrong?" Although the defendant took an exception to the exclusion of the question, no offer of proof was made. "Even in cross-examination where ordinarily an offer of proof is not required there still must be an indication that the excluded matter would be helpful." *Commonwealth* v. *Baker,* 348 Mass. 60, 63. We find no such indication. Indeed it would appear that if the psychiatrist had related the circumstances in which a suicidal person did not know right from wrong, they would have been inapplicable to the defendant's situation. Although the second psychiatrist testified that "[a] person can have suicidal impulses and still not know right from wrong," he stated that the defendant "was not suffering from any mental disease or defect," and that the defendant had the ability to distinguish right from wrong. The transcript shows that the cross-examination of the psychiatrist was vigorous and lengthy and the defendant did question the witness as to the basis for his opinion.

Assignment 19 relates to the denial of the defendant's motion for a directed verdict of not guilty of murder in the first degree. Assignment 20 relates to the denial of his motion for a directed verdict of not guilty of murder in the second degree. An examination of the record reveals that the verdict was fully supported by the evidence. There was no error in the denial of these motions.

Finally, mindful of our obligation prescribed by G. L. c. 278, § 33E, as amended by St. 1962, c. 453, we have reviewed the entire record with great care and are of opinion that justice does not require a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*