COMMONWEALTH *vs.* JOHN ALLEN CAMPBELL
(and three companion cases[1]).

Hampshire.    December 5, 6, 1966. — April 27, 1967.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Homicide.    Practice, Criminal,* Charge to jury.    *Search and Seizure.*

At the trial of indictments for murder and assault with intent to commit rape, it was reversible error to refuse to charge the jury on the subject of involuntary manslaughter where there was evidence that while the girl victim and the defendant were in a parked automobile together late one evening the girl started talking loudly, that solely to quiet her and prevent annoyance to persons nearby he placed his arm around her neck and held her for a few moments, that thereby and thereupon her death from strangulation resulted, and that the defendant did not intend

[1] One companion case is against John Allen Campbell, and two are against Richard Dennis Nietsche.

to have and did not have sexual intercourse with her and did not intend to harm her.  [398–399]

There was no error in a criminal proceeding in a refusal to suppress evidence obtained in a search of an automobile after it had been driven to a police barracks and had been seized there upon a warrant where it appeared that, although the defendant was an occasional user of the automobile, he was not its owner and was not in possession of it on the occasion in question, and that the person then in possession acceded to a request by police to drive the automobile to the barracks.  [399–401]

There was no search of an automobile merely by observation by police officers of dents in the automobile and articles on one of its seats.  [402]

A search warrant for an automobile was not invalid on the ground of falsity of a statement in the supporting affidavit that a named person was in possession of the automobile at a designated place where it appeared that, although that person was not present at that place when police officers returned there with the warrant, he was in possession of the automobile at the time the affidavit was filed.  [402]

G. L. c. 276, § 3, as amended through St. 1964, c. 557, § 4, authorizes the introduction of evidence obtained as a result of tests and experiments upon articles lawfully seized upon a warrant.  [402]

INDICTMENTS found and returned in the Superior Court on October 14, 1964.

Motions to suppress were heard by *Beaudreau,* J., and the cases were tried before him.

*William H. Welch* (*Francis E. Collins, Jr., & Stephen R. Kaplan* with him) for the defendant Nietsche.

*Efrem A. Gordon* for the defendant Campbell.

*Sanford Keedy,* District Attorney, for the Commonwealth.

REARDON, J.   On the morning of July 14, 1964, a railroad employee came upon the body of Cindy Lou Baxa, aged seventeen, in an area of Holyoke off Route 5 known as the dinosaur tracks.   The body was nude from the waist down. On the same day a pair of slacks, underwear and sneakers belonging to the deceased girl were found in Southampton, and the following morning two pairs of underpants which she was wearing on the night of July 13 were found on a dirt road which led to a cornfield in that town.

The defendants, Campbell and Nietsche, both aged seventeen, had come together in the late evening of July 13 in Williamsburg.   At that time the defendant Campbell had

possession of a 1954 Buick owned jointly by his mother and one Bourgoise, both of whom were engaged in operating a small dining establishment in Williamsburg. The defendants drove around pausing at one place for some root beer and at another for ice cream cones. They then picked up a drunken hitchhiker who desired to go to Easthampton. The Buick was low on gasoline and, in exchange for a dollar to purchase gasoline, they drove him where he wished to go. Thereafter, driving in Easthampton, they came upon two girls walking in the rain. They drove the car slowly beside the girls and the defendant Nietsche, who was a passenger in the front seat, commenced a conversation with them which continued until they arrived at the house where the Baxa girl was living with her grandmother. The Baxa girl's companion departed but she remained and, with the car stopped, a rather lengthy conversation took place, at the conclusion of which the Baxa girl accepted at midnight an invitation to ride with the defendants. She entered the car and sat on the front seat between the two defendants, whereupon Campbell drove through Easthampton into Southhampton. The car was then parked along Glendale Road or in a nearby cornfield. After certain events occurred, which will be subsequently discussed, death came to the Baxa girl.

Following some three weeks of intensive police work, Lieutenant Dunn and Sergeant O'Shea of the Holyoke police, acting upon certain information which had come to the Holyoke police department, journeyed to Williamsburg where they interviewed Nietsche who told them that he had been at home on the night of July 13. They requested that he see Campbell and accompany him to the police station at Holyoke that evening. Neither appeared on that night, which was August 3, 1964. The following morning the two officers returned to Williamsburg and the defendants agreed to accompany them to the Holyoke police station for questioning. Both defendants, after questioning at the police station, signed written statements implicating themselves in the death of Cindy Lou Baxa. The car in which they had

been riding on July 13 was thereafter seized pursuant to a warrant and examined. There was medical evidence from the medical examiner and a State pathologist that the cause of death was asphyxia due to manual strangulation with a massive hemorrhage in the region of the larynx and a bilateral fracture of the cricoid bone or cartilage. Death occurred within one to six minutes from the time pressure was applied to the region of the neck where the fracture and hemorrhage were observed. In the autopsy which took place in the late afternoon of July 14, smears were taken which upon subsequent microscopic examination disclosed the presence of sperm in the vagina and also degenerating sperm on the perineum. It was testified that the sperm in the vagina had been present approximately sixteen hours.

In the statement given by the defendant Nietsche to the Holyoke police, the contents of which were admitted only against him, Nietsche said that the girl got into the back seat while the car was being driven to the parking place. Once there, the defendants flipped a coin to determine who would be the first to get into the back seat and "attempt to do something first — I mean, have intercourse or something like that." Nietsche won the flip and went into the back seat but "did not do anything to her, I was chicken." Campbell then got into the back seat while Nietsche returned to the front seat. The girl resisted Campbell's advances. He threatened to strangle her "because she would not have anything to do with him; . . . she sat there as if she thought he would not have enough guts to do it. He noticed this and said 'you'd just sit there and let me strangle you?' She said nothing, and he started to strangle her. I could hear her gasping for air, I mean, she was choking. The gasping stopped . . . ." Campbell then began to remove her clothes and asked Nietsche to help him. They both engaged in removing her slacks and undergarments, following which Campbell had intercourse with her. Nietsche was given the opportunity to do the same but refused. They left the cornfield, and upon reaching Glendale Road Nietsche threw the deceased's garments out of the

car. Eventually her body was dumped where it was found the next morning.

Campbell's account, admitted only against him, stated that he parked the car on Glendale Road in Southampton, at which time Cindy Lou expressed some concern as to where she was being taken. Campbell and Nietsche in answer to this concern began to joke back and forth as to whether or not they should take Cindy Lou home. "She was now getting excited and talking loud, and we told her to be quiet or she would wake the neighbors. She seemed more mad than excited. She kept making noises, so I put my hand over her mouth, and she started biting my fingers. I kept my hand over her mouth, and she turned her head and my arms slipped down, and my arm was then around her throat. I didn't think I was squeezing her tight, but I guess I was. The way she was fighting made my grip tighter on her. Suddenly she stopped fighting me. I thought she was quieting down. . . . I released my hold and she fell forward on me. We were on the road and she was making funny noises with her throat and she was still slumped over, and we decided to get her out of the car fast." The defendants then began to take her clothes off, according to Campbell, to conceal her identity. These clothes were thrown out of the car while the defendants were driving along Glendale Road.

The defendants were subsequently indicted for murder and assault with intent to commit rape. Nietsche was further charged with being an accessory after the fact to the murder. Both were found guilty of assault with intent to rape and murder in the first degree with the recommendation that the death sentence be not imposed. The court directed the jury to return a verdict of not guilty on the indictment of Nietsche of being an accessory after the fact. The cases were tried pursuant to the provisions of G. L. c. 278, §§ 33A–33G. These appeals come to this court with a transcript of the evidence, a summary of the record, and the defendants' assignments of error.

1. The defendants contend that there was error in the trial judge's refusal to instruct the jury that they might re-

turn verdicts of manslaughter on the murder indictments and assault on the indictments charging assault with intent to commit rape.[2]   A trial judge is not required, however, to charge on an hypothesis which is not supported by evidence. *Commonwealth* v. *Kleciak,* 350 Mass. 679, 691–692.   *Commonwealth* v. *McCann,* 97 Mass. 580, 582.   *Commonwealth* v. *Levenson,* 250 Mass. 440, 444–445.   *Commonwealth* v. *Dawn,* 302 Mass. 255, 262.   We have held on many occasions that no error exists in a refusal to charge on manslaughter in an indictment for murder where no evidence of the lesser offence appears.   *Commonwealth* v. *Devereaux,* 256 Mass. 387, 393–394.   *Commonwealth* v. *Soaris,* 275 Mass. 291, 299.   *Commonwealth* v. *Green,* 302 Mass. 547, 556.   *Commonwealth* v. *Moore,* 323 Mass. 70, 77–78. *Commonwealth* v. *Lussier,* 333 Mass. 83, 92.   *Commonwealth* v. *Beaulieu,* 333 Mass. 640, 643–644.   *Commonwealth* v. *Hartford,* 346 Mass. 482, 490–491.   See *Commonwealth* v. *Wallace,* 346 Mass. 9, 12.   We have also held it to be error to give an instruction on manslaughter where there is no evidence to justify such an instruction.   *Commonwealth* v. *Bouvier,* 316 Mass. 489.   Equally well established is the proposition that where evidence in a murder prosecution is such that a jury could find the defendants guilty of manslaughter rather than murder it is reversible error to refuse to give such an instruction on manslaughter.   *Commonwealth* v. *Kendrick,* 351 Mass. 203.   *Stevenson* v. *United States,* 162 U. S. 313.   *People* v. *Carmen,* 36 Cal. 2d 768. *People* v. *Canada,* 26 Ill. 2d 491.   *People* v. *Draper,* 278 App. Div. (N. Y.) 298, affd. 303 N. Y. 653.   *People* v. *Oddy,* 16 App. Div. 2d (N. Y.) 585.   *Ohio* v. *Loudermill,* 2 Ohio St. 2d 79.   See *Commonwealth* v. *Meas,* 415 Pa. 41, 44–45.

The judge withdrew from the consideration of the jury the possibility of a conviction of murder committed with deliberately premeditated malice aforethought or with ex-

---

[2] We restrict our discussion to the failure of the trial judge to charge on manslaughter.   It would follow that if the judge instructed on manslaughter on the murder indictments he must also charge on simple assault on the indictments charging assault with intent to commit rape.

treme atrocity or cruelty.  See G. L. c. 265, § 1.  For that reason, the jury's verdicts of murder in the first degree could have been based only on the finding that the defendant Campbell strangled the deceased during an assault with intent to commit rape and that the defendant Nietsche aided and abetted him.  We thus review the evidence of the case of the defendant Campbell to determine whether there was evidence that his conduct which allegedly caused the death of the deceased did not occur during an assault with intent to commit rape and required an instruction on manslaughter.  The criminal responsibility of Nietsche, charged with aiding and abetting Campbell, is necessarily dependent upon that of Campbell.

The defendant Campbell took the stand in his own behalf. His testimony, which was substantially in accord with his written statement made to the police before trial, was as follows.  After engaging the deceased in conversation for approximately an hour in front of her home, the defendants invited her to take an automobile ride with them.  She agreed and got into the front seat between the two defendants.  Campbell drove to a spot on Glendale Road in Southampton where he parked the car.  They listened to the radio and talked.  Several minutes later Cindy Lou asked why they had stopped and asked to be taken home.  The defendants began to joke back and forth about whether or not they should comply with the deceased's request.  She persisted in her request in a somewhat louder voice.  Campbell then "asked her not to talk so loud, she was going to wake the neighbors, and she was still talking loud, and Richard and I were joking back and forth.  I don't know if she was scared, she was more mad.  She seemed mad. And I had my arm on the back of the seat, as it was, and I was sitting sort of, leaned against a door, and I put my hand onto her mouth.  And she bit my finger, but it wasn't hard, it wasn't a mark there or anything, and she turned her head fast, and my arm slipped onto her neck and I just held her for a second, it seemed, and then she stopped, she was sort of bucking . . . .  It wasn't a minute, it just

seemed like a couple of seconds. . . . [S]he didn't make any sign I was hurting her and she didn't say anything. I didn't think I was hurting her." Q. "What happened to her after that?" A. "Well, when she quieted down . . . I said 'That is better.' I took my arm off her and that is when I heard this sound. . . . I'm not sure what it was, it sounded like when you open a can of tennis balls, it hisses, it was a hissing sound." Q. "Well, when you heard that sound, what did Cindy Lou Baxa do?" A. "She didn't do anything, she slumped against me, she was just slumped against me. . . . I didn't think she was hurt. I said, 'Hey, get up,' you know, and she didn't move or anything, and I shook her shoulders and I said 'Get up,' and I thought she was knocked out or something . . . ." Campbell then testified that Nietsche helped him move the deceased into the back seat where he attempted to revive her by mouth-to-mouth resuscitation. These efforts proving unavailing, the defendants began to take her clothes off, ostensibly to conceal her identity, and throw them from the automobile. They then drove to the spot where they left the half-clothed body. Campbell completed his direct examination by stating that at no time did he intend to either rape or kill the deceased. On cross-examination, he denied he had any interest in the deceased, other than to take her for a ride in order to talk with her and perhaps stop at a restaurant. He further denied any intent to have relations with Cindy Lou and denied "necking" or "making out" with her. Several police officers who had interrogated Campbell and had taken his statement testified that Campbell consistently maintained that Cindy Lou Baxa's death was the result of an "accident."

Richard Amberman, a friend of Campbell's who had spoken with him the day after the deceased met her death, was called as a witness for the prosecution. He testified that on that day Campbell told him that "he was out with a girl the night before, and he was parked with her; he had his arm around her neck, and they were fooling around, and she fainted; and he said it was an accident; and he took her

pulse and gave her mouth to mouth breathing, and nothing happened. He told me he wanted to go to the police, but he was afraid they wouldn't believe it was an accident." Amberman's testimony at the trial was at variance with prior statements made by him to the police, during the probable cause hearing and before the grand jury. In these prior statements Amberman said that Campbell had told him he strangled the deceased after flipping a coin with Nietsche to see who was going to go into the back seat with the Baxa girl for the purpose of having relations with her. After strangling her when she resisted his advances, Campbell allegedly told Amberman that he then raped her. However, in testimony at the trial, Amberman persisted in his story that Campbell told him that her death was an accident in spite of these earlier statements and testimony to the contrary. At one point he did admit that the earlier statements were true,[3] but quickly retraced his steps reiterating that Campbell "didn't say he raped her." Police officers gave testimony that Amberman had told them of Campbell's statement to him that he had raped the deceased. These earlier statements, however damaging, were introduced for the purpose of showing prior inconsistent statements by Amberman only and provided the jury with no affirmative evidence in support of the prosecution's case. The judge correctly so instructed the jury.

Medical testimony adduced through a State pathologist who performed the autopsy was not necessarily inconsistent with the story advanced by Campbell. While the pathologist testified to a massive hemorrhage in the region of the larynx and a bilateral fracture of the cricoid bone or cartilage indicating the application of considerable manual force, he did state in cross-examination that pressure on the caro-

---

[3] Q. "And did you say there in answer to that, that Campbell told you she fell faint and he said — 'Campbell told me that he had raped her and then threw her clothes out and took off?'" A. "Yes." Q. "Is that what you said in the District Court?" A. "Yes." Q. "And you were under oath in the District Court?" A. "Yes." Q. "And is that what Campbell told you?" A. "He must have . . . rape is a legal term, and I don't understand it — really know what — he could have said something else like making out or —."

Commonwealth *v.* Campbell.

tid sinuses, centered on the side of the neck, could cause fainting, and severe pressure, death. He conceded the possibility that the cartilage may have been fractured at a later time, possibly when the body was dragged from the car. The pathologist further testified that a person with a history of nosebleeds would be more susceptible to internal hemorrhaging from lesser pressure than an individual who did not suffer from them.[4] There was some evidence that the deceased girl suffered nosebleeds with somewhat greater frequency than normal.

Examination of the lower half of the deceased's body, including her private parts, revealed no evidence of lacerations, bruises, or other trauma generally associated with forcible penetration. Additional medical testimony from the pathologist indicated that superficial abrasions on the back and buttocks of the deceased were sustained after death. The pathologist testified to his detection of the presence of sperm in and around the vagina of the deceased and stated that while sperm can live up to twenty-four hours and perhaps up to four days, the deposit in this case had been made "at the time of death or shortly before." There was evidence that prior to meeting the defendants the deceased, in company with her girl companion, had been out riding with two other boys in Easthampton. Notwithstanding the high probability against it, it was open to the jury to find that Campbell did not have intercourse with the deceased.

We thus reach the problem of whether there was evidence to warrant a jury in finding that the defendant Campbell's acts constituted manslaughter. Manslaughter imports the taking of human life by an act not justified in law, but without malice aforethought which is necessary to constitute

---

[4] A. " . . . It's my opinion that it came from increased pressure in the neck that caused increased pressure in the membrane. Now, you tell me that she had nose bleeds, which explains it even better." Q. "Now, what explains what better?" A. "That she had nose bleeds; and then the pressure here would not have to be as great as if she didn't have nose bleeds." Q. " . . . Isn't it your testimony that because of the condition of nose bleeds, a lesser pressure, not a massive pressure, could cause this?" A. "Possibly." Q. "That could have been accidental?" A. "Possibly."

murder. *Commonwealth* v. *Demboski,* 283 Mass. 315, 322, and cases cited. We need not consider voluntary manslaughter since in the instant case there was no evidence that Campbell killed the deceased in "a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon a sudden combat." *Commonwealth* v. *Bouvier,* 316 Mass. 489, 494. *Commonwealth* v. *Webster,* 5 Cush. 295, 304–308. *Commonwealth* v. *Soaris,* 275 Mass. 291, 299. *Commonwealth* v. *Baker,* 346 Mass. 107, 119. *Commonwealth* v. *Hartford,* 346 Mass. 482, 490–491.

Involuntary manslaughter is an unlawful homicide, unintentionally caused (1) in the commission of an unlawful act, malum in se, not amounting to a felony nor likely to endanger life (Anderson, Wharton's Criminal Law and Procedure, s. 289), or (2) by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct. *Commonwealth* v. *Welansky,* 316 Mass. 383, 399. *Commonwealth* v. *Bouvier,* 316 Mass. 489, 494–496. *Commonwealth* v. *Atencio,* 345 Mass. 627, 629. *Commonwealth* v. *Wallace,* 346 Mass. 9, 12. See *Commonwealth* v. *Woods,* 339 Mass. 7, 11–12.

Campbell's testimony that he placed his arm around the deceased's throat and held her for several moments to quiet her down could be found to constitute a battery or assault and battery if it is believed that such conduct occurred not with intent to commit rape. "An assault and battery is the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *Commonwealth* v. *McCan,* 277 Mass. 199, 203, and cases cited. An assault and battery is classified as a misdemeanor and not a felony. G. L. c. 265, § 13A. Manslaughter is simply a battery that causes death. *Commonwealth* v. *Sostilio,* 325 Mass. 143, 145, and cases cited.

The jury could also have found Campbell's conduct consistent with a failure to regard the consequences of his action or an indifference to what the consequences of his ac-

tion might have been, thus rising to wanton or reckless conduct. "The essence of wanton and reckless conduct is intentional conduct, . . . which conduct involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky,* 316 Mass. 383, 399. This is so even though such a result was not intended. *Commonwealth* v. *Thompson,* 6 Mass. 134, 140–141. *Commonwealth* v. *Pierce,* 138 Mass. 165, 177, and cases cited. *Commonwealth* v. *Hawkins,* 157 Mass. 551, 553.

When there is added to Campbell's contentions regarding the death of the Baxa girl and his intent, the possibility of accident alluded to by the pathologist, and other considerations referred to above, we can only conclude that the trial judge should have charged on manslaughter and that it is necessary to have a new trial. "The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. . . . That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true." *People* v. *Carmen,* 36 Cal. 2d 768, 773.

We cannot accept the Commonwealth's contention that no instruction on manslaughter was necessary on the ground that even if the testimony of Campbell is believed it showed either (1) that he assaulted Cindy Lou while forcibly restraining her and imprisoning her in the car in violation of G. L. c. 265, § 26, or (2) that his deliberate application of force was such that malice should be implied notwithstanding Campbell's statement that he did not intend to kill the deceased.

General Laws c. 265, § 26, our kidnapping statute, has not been applied to facts similar to those now before us. We are reluctant to apply this statute on review when it was not raised below.

In addition, we cannot agree that Campbell's conduct requires that malice be implied. It is true "that it is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and that, reduced to its lowest

terms, malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification." *Commonwealth* v. *Chance,* 174 Mass. 245, 252. See *Commonwealth* v. *Fox,* 7 Gray, 585, 587–588; *Commonwealth* v. *Pierce,* 138 Mass. 165, 178; *Commonwealth* v. *Gordon,* 307 Mass. 155, 158; *Commonwealth* v. *Gricus,* 317 Mass. 403, 410–411. This simply means in such circumstances that a jury could imply malice and render a verdict of second degree murder which would be upheld on appeal. However, Campbell's testimony that he did not even intend to harm the deceased, that he "just wanted her to be quiet" when he placed his arm around her neck and held her for a few moments would also warrant a jury in finding that the killing was without malice.

Campbell further complains that the trial judge erred in refusing to grant instructions that he may not have been guilty of any crimes on the theory that the death was accidental or due to negligence not arising to criminal responsibility. See *Commonwealth* v. *Bouvier,* 316 Mass. 489. There is no evidence that the deceased died by a cause other than asphyxia due to manual strangulation, or as a result of conduct other than that of the defendant Campbell. His act in placing his arm around the deceased's neck in order to quiet her was intentional conduct on his part. Even if the deceased died as a result of accidental pressure on the carotid sinuses, Campbell's conduct still amounted to a battery. Restatement: Torts 2d, § 13. We have already cited *Commonwealth* v. *Sostilio,* 325 Mass. 143, 145, as holding that manslaughter is simply a battery that causes death.

2. Since there is to be a retrial we will discuss certain of the defendants' assignments of error which will bear on issues at the retrial.

The defendants have argued assignments based upon the refusal of the trial judge to suppress evidence obtained as a result of the search and seizure of the 1954 model Buick

which was occupied by the defendants on the night of the death of Cindy Lou Baxa. The facts on the seizure of the car are as follows. On the evening of August 4, 1964, Walter Bourgoise, who owned the automobile jointly with the defendant Campbell's mother, gave Richard Amberman permission to use it. While parked with a girl at a drive-in theatre, he was approached by police who asked him to drive it to the Holyoke police station, and later to the Northampton State police barracks. There it was seized pursuant to a warrant. At the trial photographs of tire tracks of the car made in a test were introduced for purposes of comparison with prints found in the cornfield where the alleged murder took place. The contention is that there was an illegal seizure of the car without a warrant at the theatre which was not rendered valid by the subsequent issuance of a search warrant.

In our view the evidence was admissible on at least two grounds. First, the interest of the defendants in the car was not such as to give them standing to contest successfully the legality of its search and seizure. "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber* v. *United States,* 384 U. S. 757, 767. It has been held to extend to a person in possession or occupancy of the premises searched or the property seized. *Jones* v. *United States,* 362 U. S. 257, 263–264. *Fisher* v. *United States,* 324 F. 2d 775, 780 (8th Cir.). See *Commonwealth* v. *McCleery,* 345 Mass. 151. It also extends to the person who owns or possesses property and stores it on the premises of another to which he has access at will. *United States* v. *Jeffers,* 342 U. S. 48. The defendants cannot avail themselves of either of these principles. Neither owned the automobile. Campbell's interest was at most that of an occasional bailee of a vehicle owned in part by his mother. When the car was seized neither defendant had possession of it. These facts distinguish this case from *Commonwealth* v. *McCleery,* 345 Mass. 151, upon which the defendants rely, where a bailee in possession of an automo-

bile was held to have standing to contest the legality of a search upon it. The circumstances are more closely similar to those in *Commonwealth* v. *Raymond,* 412 Pa. 194, where the Supreme Court of Pennsylvania denied the standing of a defendant to question the legality of a search of a bedroom in the house of his cousin where he slept on occasion. Nor is there evidence that Campbell had access to the car at will or any interest in it at times other than when he had it in possession. See *Commonwealth* v. *Mayer,* 349 Mass. 253. A fortiori, the defendant Nietsche, as only an occasional passenger in the car, also lacks standing to contest the legality of the search. *State* v. *Worley,* 383 S. W. 2d 529, 534 (Mo. 1964).

The evidence is also admissible for the second reason that Amberman consented to all that occurred to the car after he was approached by the police at the theatre and prior to the issuance of the warrant. The contention of the defendants is that Amberman did not voluntarily consent to drive the car from the theatre but was coerced into doing so by the police who escorted him to the police station in Holyoke as well as on the later trip to Northampton. There is no evidence, however, that Amberman was threatened or intimidated in any manner. He was not placed under arrest or accused of any part of the crime. The oppressive circumstances detailed in *Judd* v. *United States,* 190 F. 2d 649 (Ct. App. D.C.), relied upon by the defence, are absent in this case. In the *Judd* case, after the arrest and jailing of the appellant he was transported to his home in handcuffs by four police officers who proceeded to carry out a search of the premises. Not unreasonably the case held that given those circumstances the appellant could not be said to have consented voluntarily to a search of his home. The defendants seek in effect to have us accept the proposition that coöperation by a citizen in response to a polite and reasonable request by a police officer is coercion as a matter of law. This we decline to do. See *Commonwealth* v. *Roy,* 349 Mass. 224, 229. See also *Commonwealth* v. *Lehan,* 347 Mass. 197, 205, and cases cited; *Grillo* v. *United States,*

336 F. 2d 211, 213 (1st Cir.). Cf. *Wong Sun* v. *United States,* 371 U. S. 471, 486, n. 12.

Other contentions raised by the defendants in this area are equally without merit. Amberman did not lose control over the car simply because Mrs. Campbell, one of its owners, was at the Holyoke police station when he arrived there with it. There is no evidence that he saw her there at all. As rightful bailee of the automobile with possession and control, he was empowered to do whatever was reasonable and consistent with the conditions subject to which the car was entrusted to him by Bourgoise. See *United States* v. *Eldridge,* 302 F. 2d 463 (4th Cir.). Nor did observation by police officers at the Holyoke police station of dents in the automobile and articles in the back seat constitute a search within the meaning of the Fourth Amendment. *Commonwealth* v. *LaBossiere,* 347 Mass. 384, 386. *United States* v. *Lee,* 274 U. S. 559, 563. *Davis* v. *United States,* 327 F. 2d 301, 305, and cases cited (9th Cir.). *Fagundes* v. *United States,* 340 F. 2d 673, 676 (1st Cir.). The statement in the affidavit in support of the search warrant that the automobile was in the possession of Richard Amberman at the Northampton State police barracks cannot be said to be false merely because Amberman was not present at the barracks when the officers returned with the warrant. Lieutenant Dunn of the Holyoke police testified that to his knowledge Amberman was in possession of the automobile at the time he filed the affidavit. We further believe that the grant of power contained in G. L. c. 276, § 3, as amended through St. 1964, c. 557, § 4, that articles seized pursuant to a warrant be kept "so long as necessary to permit them to be produced or used as evidence on any trial" authorizes the introduction of evidence obtained as a result of tests and experiments upon such lawfully seized items. For these reasons there was no error in the denial of the defendants' motion to suppress.

In view of our disposition of the case we refrain from discussing other assignments of error set forth by the defendants. It is sufficient to say that many of them had

to do with matters arising from the exercise of judicial discretion.

It is noted that in connection with this case some three days before trial were employed in hearing motions to suppress the oral and written statements made by the defendants. In addition, a voir dire was held during trial on the voluntariness of these same statements. This hearing lasted one day but could easily have consumed another had not counsel wisely agreed to incorporate testimony taken during the pre-trial hearing. Telescoping of these two hearings is a matter for the exercise of sound judicial discretion. Upon the return of the jury, the evidence went in for a third time over a period of a day and a half. A single hearing held before trial could have disposed of the issue of voluntariness as well as those raised by the motions to suppress. Other circumstances may make it appropriate to hold a voir dire during trial. See in this regard *Commonwealth* v. *LePage* below.

*Judgments reversed and verdicts set aside.*