William **NADWORNY**, Petitioner,

v.

Michael **FAIR**,[1] **Commissioner of Corrections, Respondent.**

**Civ. A. No. 87–2880–Y.**

United States District Court,
D. Massachusetts.

July 30, 1990.

---

**1.** The Court takes judicial notice, Fed.R.Evid. 201, that George Vose has replaced Michael Fair as Massachusetts Commissioner of Corrections. No amendment has been proposed to name the present Commissioner as a party. Since nothing turns on the point, reference is made herein to the "Commissioner."

Charles Burnim, Boston, Mass., for petitioner.

Judy Zeprun, Annette Benedetto, Asst. Attys. Gen., Crim. Bureau, Boston, Mass., for respondent.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

### I. BACKGROUND

On June 8, 1983, an Essex County Grand Jury indicted William Nadworny ("Nadworny") for the first degree murder of Lisa Belmonte ("Ms. Belmonte" or "victim") on a date sometime between March 18, 1982 and July 19, 1982.[2] Pre-trial proceedings were held before Justice Andrew R. Linscott of the Massachusetts Superior Court and trial came on before Justice Robert Barton of that court, sitting with a jury. The jury convicted Nadworny of second degree murder on June 12, 1984, and Mr. Justice Barton sentenced him to a term of life imprisonment at the Massachusetts Correctional Institute at Cedar Junction. The Massachusetts Supreme Judicial Court granted direct appellate review and, on December 11, 1985, affirmed the conviction. *Commonwealth v. Nadworny*, 396 Mass. 342, 486 N.E.2d 675 (1985). Nadworny filed a timely Petition for Rehearing, which the Supreme Judicial Court denied on February 10, 1986. Nadworny then filed a petition for writ of certiorari in the United States Supreme Court. That petition was denied on June 23, 1986. *Nadworny v. Massachusetts*, 477 U.S. 904, 106 S.Ct. 3274, 91 L.Ed.2d 564 (1986).

On November 10, 1987, Nadworny filed this habeas petition in which he claimed the following six constitutional grounds for relief: 1) denial of due process because there was insufficient evidence to convict ("Ground One"); 2) denial of due process by reason of misapprehension of the Supreme Judicial Court of facts critical to the requirement of a lesser included offense instruction of manslaughter ("Ground Two"); 3) denial of due process in the refusal of an instruction on the lesser included offense of manslaughter ("Ground Three"); 4) denial of due process and compulsory process by the exclusion of evidence tending to give the reason for making a certain statement ("Ground Four"); 5) erroneous introduction of statements obtained in violation of his right against self-incrimination ("Ground Five"); and 6) erroneous introduction of a letter which was authenticated in a manner that violated his right against self-incrimination ("Ground Six").

On December 3, 1987, the Court ordered the Commissioner to file an answer to the habeas petition. The Commissioner answered on January 26, 1988, maintaining that Nadworny had failed to exhaust all of the post-conviction state remedies available to him and that, therefore, petitioner's procedural default barred habeas review of three of his six claims. The Court accepted the position of the Commissioner and, in an opinion dated May 19, 1989, dismissed the petition on the grounds that Nadworny had not exhausted post-conviction state remedies with respect to Grounds One, Two, and Three. *Nadworny v. Fair*, 685 F.Supp. 20, 23 (D.Mass.1988), *rev'd*, *Nadworny v. Fair*, 872 F.2d 1093 (1st Cir.1989). Nadworny appealed the dismissal, asserting that, with respect to Grounds One, Two, and Three, he had exhausted all of the post-conviction state remedies available to him. On April 20, 1989, the First Circuit ruled that this Court had misapplied the test for exhaustion of state remedies and remanded petitioner's case for further proceedings on the merits. *Nadworny v. Fair*, 872 F.2d 1093, 1103 (1st Cir.1989).

Upon remand, this Court ordered further briefing and heard arguments on the merits of the petitioner's claims. A careful review of the record thus developed per-

---

**2.** The facts of this case are set forth in detail in the opinion of the Massachusetts Supreme Judicial Court, *Commonwealth v. Nadworny*, 396 Mass. 342, 345–53, 486 N.E.2d 675, *cert. denied,* *Nadworny v. Massachusetts,* 477 U.S. 904, 106 S.Ct. 3274, 91 L.Ed.2d 564 (1985). For that reason, the Court will recite only those facts necessary for its analysis.

mits resolution of five of the six claims in favor of the Commissioner but, in view of intervening legal developments, requires still further briefing on one claim.

## II. DISCUSSION

### A. *Sufficiency of Evidence*

Nadworny's first ground is that there was insufficient evidence to convict him of second degree murder. Specifically, he maintains that there was insufficient evidence to allow a jury to find beyond a reasonable doubt that he caused the death of Ms. Belmonte with malice aforethought or indeed that there was any criminal agency by him in her death sufficient to support a finding of any type of homicide.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court articulated the standard to be applied in a federal habeas proceeding when the claim is made that a person has been convicted in a state criminal proceeding upon insufficient evidence. That standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789. With respect to the manner in which a federal habeas court must analyze the sufficiency of evidence, the Supreme Court held that "the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n. 16, 99 S.Ct. at 2792 n. 16. Finally, when applying the standard, "[a] federal court has a duty to assess the historic facts...." *Id.* at 318, 99 S.Ct. at 2788.

Massachusetts defines the substantive elements of murder by statute in the following manner:

> Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear

to be in the first degree is murder in the second degree.... The degree of murder shall be found by the jury.

Mass.Gen.Laws Ann. ch. 265, sec. 1 (West 1970). The Supreme Judicial Court of Massachusetts has further defined second degree murder by holding that "the Commonwealth must prove that there was an unlawful killing with malice aforethought." *Commonwealth v. Begin*, 394 Mass. 192, 197 474 N.E.2d 1120 (1985) (citing *Commonwealth v. McCauley*, 355 Mass. 554, 559, 246 N.E.2d 425 [1969]). In addition, the Supreme Judicial Court has held that "[t]he malice aforethought necessary for second degree murder requires a finding that the defendant intended to inflict injury on the victim without legal excuse or palliation." *Commonwealth v. Estremera*, 383 Mass. 382, 394, 419 N.E.2d 835 (1981) (citing *Commonwealth v. McGuirk*, 376 Mass. 338, 344–45, 380 N.E.2d 662 [1978], *cert. denied*, 439 U.S. 1120, 99 S.Ct. 1030, 59 L.Ed.2d 80 [1979]). Finally, while intent to kill is not a necessary element of second degree murder, *Begin*, 394 Mass. at 197, 474 N.E.2d 1120, "at the very least [the defendant] must have intended 'to do an act creating a plain and strong likelihood that death or grievous harm will follow.'" *Estremera*, 383 Mass. at 395, 419 N.E.2d 835 (quoting *Commonwealth v. Huot*, 380 Mass. 403, 408, 403 N.E.2d 411 [1980]) (overruled on other grounds by *Commonwealth v. Bray*, 407 Mass. 296, 553 N.E.2d 538 [1990]). In sum, under Massachusetts law, there are three essential elements of the crime of second degree murder: (1) there must be an unlawful killing, (2) the killing must be committed by the defendant, and (3) the killing must be committed with malice aforethought.

As to whether there has been an unlawful killing, the Commonwealth produced sufficient evidence, when viewed in the light most favorable to the prosecution, to enable a rational factfinder to find beyond a reasonable doubt that Ms. Belmonte had been killed. First, the Commonwealth provided at trial four witnesses,[3] each of

---

3. The four witnesses were: Patricia Thompson, the victim's social worker; Earl Bethune, the

defendant's best friend; Curt Willis, the victim's

whom testified to the effect that Ms. Belmonte was at Nadworny's apartment on the evening of her disappearance. Second, the Commonwealth provided testimony tending to show that Nadworny himself had acknowledged that Ms. Belmonte's death had occurred in his apartment on the night of her disappearance.[4] Third, another witness[5] testified that Nadworny had told him that the Commonwealth's evidence against him included "blood stains from Lisa's body" found on his apartment floor, thus allowing the jury to infer that the stain on the rug in Nadworny's apartment was Ms. Belmonte's blood.

In addition, a rational factfinder could find beyond a reasonable doubt that the cause of Ms. Belmonte's death was neither natural causes nor accident nor suicide. With respect to Ms. Belmonte's health, there was nothing in the testimony of any of the witnesses who knew her while she was alive[6] to the effect that she was in ill health. While there was testimony that Nadworny had told Patricia Flynn that Ms. Belmonte had "shot up" insulin and that there was a family history of diabetes, Ms. Belmonte had tested negative for diabetes on September 24, 1981, less than six months prior to her disappearance. Dr. Butt, the pathologist who examined Ms. Belmonte's body, testified that it was extremely unlikely that she had died of natural causes. Dr. Butt testified further that there was no evidence of either major trauma to the body or pills in her stomach, thus tending to rule out that Ms. Belmonte's death had been due to an accident. Although there was testimony that Nadworny had told his friends that Ms. Belmonte had "overdosed," and it is possible that any evidence of pills in the victim's stomach could have disappeared by the time her body was found, such evidence does not compel the conclusion that the victim died from a drug overdose. Finally, a rational

factfinder could properly find that Ms. Belmonte's death had not been caused by suicide, because each witness[7] who testified concerning her state of mind just prior to her disappearance observed that she was alert, friendly, and functioning well in all areas with excellent morale.

Also, there was sufficient evidence to permit a rational factfinder to find beyond a reasonable doubt that Nadworny had been the one who killed Ms. Belmonte. First, the jury could believe that Nadworny had a motive to kill Ms. Belmonte because there was evidence that Ms. Belmonte intended to end her relationship with Nadworny on March 18, 1982, the night she went to visit him. Moreover, there was evidence that Nadworny was still in love with Ms. Belmonte and now felt "used." Second, there was evidence from which the jury could conclude that Nadworny was the only one present when Ms. Belmonte died. Third, there was a great deal of evidence which tended to show that from the time Ms. Belmonte met her death until the time her body was discovered, Nadworny had been concealing her body, thus allowing the jury to infer that he had been attempting to conceal a criminal act. Fourth, there was testimony that Nadworny had asked a friend to "alibi" for him, again allowing a rational factfinder to conclude that he had been attempting to conceal a criminal act. Fifth, there was testimony that Nadworny had told inconsistent stories both about Ms. Belmonte's condition on the day she disappeared and about her whereabouts after her disappearance, again allowing the inference that he was trying to conceal a criminal act. When the evidence is viewed in the light most favorable to the prosecution, it is sufficient to permit a rational factfinder to find beyond a reasonable doubt not only that Ms. Belmonte had been killed but also that she had been killed by

---

other boyfriend; and Debby Lewis, the victim's best friend.

**4.** The witnesses who provided this testimony were: Earl Bethune; Vanessa Bethune, his wife; and Debby Lewis.

**5.** Thomas Pagano.

**6.** These witnesses included the victim's mother.

**7.** The witnesses who testified to Lisa's state of mind were Patricia Thompson, Curt Willis, Debby Lewis, and Ms. Belmonte's mother.

Nadworny in his apartment when no one else was present.

After viewing the evidence in the light most favorable to the prosecution, the Court concludes that a rational factfinder could have found beyond a reasonable doubt that the defendant had the requisite mental state, i.e., malice aforethought. First, as the Court has already held, *supra*, a rational factfinder could have found beyond a reasonable doubt that Nadworny had killed Ms. Belmonte in his apartment while they were the only ones present. From this finding, a factfinder could find further that Nadworny had intentionally caused her death, thus supporting a finding of malice aforethought. Second, a rational factfinder could have found that Nadworny had intended to harm Ms. Belmonte "from the testimony concerning ... the disposal of the evidence [i.e., the victim's body]." *Commonwealth v. Amazeen*, 375 Mass. 73, 81, 375 N.E.2d 693 (1978).[8] In sum, after viewing the evidence in the light most favorable to the Commonwealth, the Court holds that there was sufficient evidence to allow a rational factfinder to find beyond a reasonable doubt that Nadworny unlawfully killed Ms. Belmonte with malice aforethought.

### B. *Adequacy of Appellate Review*

■ Nadworny's second ground is that, in reviewing his conviction, the Supreme Judicial Court failed to consider fully several theories supporting an involuntary manslaughter instruction. Specifically, Nadworny points out that the Supreme Judicial

Court's recitation of the facts contains one "clear error" and one "significant" omission. Petitioner's Memorandum of Law on the Merits of his Grounds for Granting His Petition for Writ of Habeas Corpus at 5.

The short answer to this contention is that it is simply not a claim upon which relief may be granted. *Application of Gordon*, 157 F.2d 659 (9th Cir.1946) (habeas corpus not available for relief from alleged misstatement of facts by a state appellate court); *White v. Beto*, 213 F.Supp. 592, 595 (S.D.Tex.1963), *aff'd*, 322 F.2d 214 (5th Cir.1963), *cert. denied, White v. Beto*, 376 U.S. 925, 84 S.Ct. 687, 11 L.Ed.2d 620 (1964) ("[A]ppeal, or a defect in perfecting or prosecuting an appeal, is not a necessary element of 'due process of law' which lays the basis for discharge on habeas corpus.") (citing *Casebeer v. Hudspeth*, 114 F.2d 789 [10th Cir.1940] ). Indeed, there is no federal right to any state appellate review of a state criminal conviction. *Estelle v. Dorrough*, 420 U.S. 534, 536, 95 S.Ct. 1173, 1175, 43 L.Ed.2d 377 (1975); *Griffin v. Illinois*, 351 U.S. 12, 21, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring) ("[D]ue process of law does not require a State to afford review of criminal judgments."). Accordingly, even if the Supreme Judicial Court misstated the facts of record in its decision—a matter as to which this Court expresses no opinion—a petition for habeas corpus affords no relief.[9]

### C. *Exclusion of Evidence*

As his fourth ground, Nadworny maintains that the Justice of the Superior Court

---

**8.** The Supreme Judicial Court cites *Commonwealth v. Amazeen*, 375 Mass. 73, 81, 375 N.E.2d 693 (1978), for the proposition that the jury could have also inferred intent from the "condition of the [victim's] body." *Nadworny*, 396 Mass. at 358, 486 N.E.2d 675. A careful reading of *Amazeen*, however, leads this Court respectfully to disagree with the Supreme Judicial Court's analysis. In *Amazeen*, the jury was allowed to infer intent to harm from the condition of the victim's body because it bore the marks of a violent death, i.e., a crushed skull and chest. On the contrary, Ms. Belmonte's body bore no such marks; in fact, the exact cause of her death is still uncertain. Therefore, this Court cannot help but conclude that a rational factfinder could not find from the condition of Ms. Belmonte's body that the defendant had intended to injure her.

**9.** Even assuming *arguendo* that Nadworny is correct in maintaining that the Supreme Judicial Court made a "clear error" and a "significant" omission in its recitation of facts, the only harm he claims to have suffered is that the state high court did not fully consider his theories on lesser included offenses. Because this Court analyzes petitioner's theories on lesser included offenses upon the actual trial records—thus correcting the "error" and "omission," so called, in the Supreme Judicial Court's recitation of the facts—no harm will befall Nadworny, as the availability of habeas corpus relief will in no way turn on the challenged recitation. *See infra* note 23.

excluded admissible evidence and as a result denied him his constitutional right to compulsory process and a fair chance to maintain his defense. In order to show Nadworny's consciousness of guilt, the Commonwealth put on testimony that the defendant had told Earl Bethune that the victim had been seen after her disappearance in New Hampshire hijacking trucks. Nadworny attempted to rebut any inference that this remark was evidence of his consciousness of guilt by offering his father's testimony that he had told Nadworny that a police officer had told him that the victim had been seen in New Hampshire hijacking trucks. The trial court, however, refused to admit the testimony of petitioner's father on this subject.

■ To determine whether a claim based on an alleged error in an evidentiary ruling is cognizable in a habeas proceeding, this Court must consider whether the alleged error was of "sufficient impact to constitute a denial of due process." *Niziolek v. Ashe*, 694 F.2d 282, 287 (1st Cir.1982); *see also Collins v. Scully*, 755 F.2d 16, 18 (2d Cir.1985) (error must be "so pervasive as to have denied him a fundamentally fair trial") (citations omitted); *Urquhart v. Lockhart*, 726 F.2d 1316, 1318 (8th Cir.1984) ("The admission of the challenged testimony ... was not so prejudicial so as to deny ... due process."); *Brinlee v. Crisp*, 608 F.2d 839, 850 (10th Cir.1979), *cert. denied*, *Brinlee v. Crisp*, 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980) ("State court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights.") (citations omitted). If the proffered evidence is cumulative, then petitioner has not suffered a denial of his due process rights. *See Salemme v. Ristaino*, 587 F.2d 81, 86 (1st Cir.1978) (where erroneously admitted

evidence was merely cumulative, claim does not reach the constitutional threshold required for habeas relief).

■ Assuming *arguendo* that the trial court erred in excluding petitioner's father's proffered testimony,[10] this Court holds that petitioner does not state a claim cognizable in a habeas corpus proceeding, because the evidence excluded would, at best, merely have rebutted one aspect of consciousness of guilt evidence that was itself already cumulative. If Nadworny's father's testimony had been admitted, the best petitioner could have hoped for was that it would have completely rebutted any inference of consciousness of guilt resulting from his statement to Earl Bethune that the victim had been seen in New Hampshire hijacking trucks.[11] Even so, there was "ample and substantial additional evidence of consciousness of guilt in this case to remove any possibility of prejudice to the [petitioner]." *Nadworny*, 396 Mass. at 362, 486 N.E.2d 675. First, Nadworny had asked a witness to "alibi" for him as to his whereabouts on the night of the victim's disappearance. Second, Nadworny told that same witness not to let visitors into his apartment because they would want to know where the victim was. Third, Nadworny gave a false account of a telephone call ostensibly made by the victim from a motel. Fourth, Nadworny told the manager of his apartment building that he would clean a bin emitting the odor of a dead body. Fifth, Nadworny tried to conceal the dead body in the trunk of his car. Sixth, after being arrested, Nadworny told various people that the victim had died of a drug overdose. In addition, the jury could have inferred that Nadworny was in possession of the victim's body at the time he told Earl Bethune that she was in New Hampshire hijacking trucks and thus must have known his father's remark to have

---

10. The Commonwealth appears to concede that the trial justice erred in not admitting petitioner's father's testimony that a police officer had told him that the victim had been seen in New Hampshire hijacking trucks, and that he had told his son. *See* Commonwealth's Memorandum in Opposition to Petition for Writ of Habeas Corpus at 12–14.

11. The Court finds it difficult to believe that the jury would have given a great deal of weight to exculpatory, unverifiable testimony provided by Nadworny's father but proceeds on that assumption in this decision.

been inaccurate. There being in fact no error in the exclusion of such marginally relevant evidence, no habeas corpus relief is warranted on this basis.

### D. *Statements Made to the Police*

Nadworny's fifth ground is that the justice of the Superior Court violated his Fifth Amendment privilege against self-incrimination by admitting statements he had made to a police officer over the phone. During the conversation in question, the officer had asked Nadworny if he knew the location of the victim. Nadworny answered "she overdosed five months ago" and then immediately said "I don't want to talk about it." The officer, however, continued to question petitioner about the victim's whereabouts. Although he had indicated that he did not want to talk about it, Nadworny went on to tell the officer that "he did not want to go to jail, that he could not hack it and that he needed time to think and might contact the officer later." [12] Nadworny maintains that his reply amounted to a confession, understandable as "I did it, but I don't want to go to jail." Nadworny further maintains that, given the police officer's motivation to arrest him, it would be unrealistic to treat the confession as anything but involuntary.

With respect to the issue of whether the Commonwealth violated Nadworny's right not to incriminate himself, the reasoning in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), is directly on point:

> [T]his prohibition [against self-incrimination] not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*Id.* at 426, 104 S.Ct. at 1141 (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 [1973]). A telephonic interrogation conducted by a police officer investigating a crime fits within the *Murphy* Court's definition of an informal criminal proceeding. Moreover, in this case, Nadworny's statements were used to incriminate him in a future criminal proceeding, i.e., his trial in the state court. Because petitioner has a Fifth Amendment privilege not to answer the police officer's questions, it was error for the Superior Court Justice to admit Nadworny's answers unless, in fact, Nadworny had answered voluntarily, as that judge has concluded.

While a state court's findings of historical fact are generally entitled to a presumption of correctness under 28 U.S.C. sec. 2254(d), in addressing the issue of the voluntariness of petitioner's incriminating statements, this Court must make its own determination on an independent review of the record. *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (citations omitted); *Paxton v. Jarvis*, 735 F.2d at 1308 (citations omitted). That review is "essentially one of fact." *Castleberry v. Alford*, 666 F.2d 1338, 1342 (10th Cir.1981). While it is probably true that the police officer exerted some subtle psychological pressure on Nadworny (whether intentional or not), this Court, after a thorough and independent review of the written record, finds by a fair preponderance of the evidence [13] that the police

---

**12.** The state trial court's finding of historical facts are presumed correct. 28 U.S.C. sec. 2254(d) (1977); *Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981); *Castleberry v. Alford*, 666 F.2d 1338, 1343 (10th Cir.1981) (applying sec. 2254[d] to Fifth Amendment issue); *Paxton v. Jarvis*, 735 F.2d 1306, 1308 (11th Cir.1984), *cert. denied*, 469 U.S. 935, 105 S.Ct. 335, 83 L.Ed.2d 271 (1984).

**13.** The futility of petitioner's claim on this ground is underscored by noting that this Court need only find voluntariness by a fair preponderance of the evidence, *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972), *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), while under state law, the Superior Court Justice was required to find—and did find—voluntariness beyond a reasonable doubt, *Commonwealth v. Day*, 387 Mass. 915, 921, 444 N.E.2d 384 (1983). The court then put that issue to the jury, which, inferentially, also found the statement voluntary beyond a reasonable doubt, if they considered it at all. Of all the states in the Union, only Massachusetts, New York, and New Jersey re-

officer did not pressure Nadworny to the point that his will was overborne and his statements were involuntary. As both Nadworny and the Commonwealth agree, Nadworny was not in custody. In fact, because Nadworny called the police officer, the officer had no idea where petitioner was during their conversation. This was not a situation in which the police officer, knowing Nadworny's location, had only to go there to arrest him. *Cf. Commonwealth v. Burke*, 339 Mass. 521, 531–33, 159 N.E.2d 856 (1959) (holding that defendant had the right to refuse to answer questions put to him by police officer who had called him). Moreover, there is nothing in the police officer's statements to Nadworny that reveal any attempt at coercion. For example, the police officer did not threaten Nadworny with the prospect of prosecution for his role in the disappearance of the victim. Because Nadworny's statements were voluntary, the trial court judge did not commit error by admitting them.

### E. *The Handwriting Exemplars*

■ Nadworny's sixth ground is that the exemplars of his handwriting which were used as evidence against him contained significant testimonial characteristics and thus violated his privilege against self-incrimination. At Nadworny's trial, a letter purportedly written by him to the victim was authenticated by a handwriting expert who testified on the basis of handwriting exemplars furnished by Nadworny. Each of the two exemplars contained the statement:

> The above are samples of my handwriting with my right/left hand. I normally write with my right/left hand.

*Nadworny* 396 Mass. at 362–63, 486 N.E.2d 675. Nadworny maintains that his exemplars were testimonial in the sense that they revealed that he was right-handed. Moreover, because this information was available to the Commonwealth only through the exemplars themselves, the

handwriting expert would not have known whether petitioner was left-handed or right-handed without them. Consequently, it is argued that the expert's authentication of the letter as written by Nadworny would have been subject to more effective attack had the expert not been in possession of the exemplars.

Although the Court finds no case directly on point, the most logical reading of the cases which have considered handwriting exemplars leads to the conclusion that these exemplars are indeed testimonial. First, in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the United States Supreme Court reasoned that physical evidence is also testimonial evidence if the "Government is ... relying on the 'truthtelling' of the [defendant] to prove the existence of or his access to the [physical evidence]." *Id.* at 411, 96 S.Ct. at 1581. Here the Commonwealth is relying on the "truthtelling" of Nadworny with respect to whether he is right-handed or left-handed in order to help prove that he was the one who wrote a letter to the victim. Second, while the United States Supreme Court has held that "[a] mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the Fifth Amendment's] protection," *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967), the content of what was written, i.e., whether petitioner is right-handed or left-handed, is at issue in this case. Therefore, each exemplar is a "communication" within the meaning of *Gilbert*. *See id.* at 266, 87 S.Ct. at 1953 ("The [Fifth Amendment] privilege reaches only compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications....'") (quoting *Schmerber v. California*, 384 U.S. 757, 763–64, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966).[14]

---

quire that voluntariness be demonstrated beyond a reasonable doubt to two separate factfinders in two separate hearings. *Commonwealth v. Sperrazza*, Norfolk County No. 7772, slip op. at 6–20 (Mass.Superior Ct., Dec. 31, 1984) (collecting cases), *aff'd*, 399 Mass. 1001, 503 N.E.2d 648 (1987).

**14.** Unlike the instant case, petitioner in *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), never made the claim "that

However, even if the trial justice erred in admitting the exemplars—a point on which this Court expresses no opinion— the admission of these exemplars was harmless beyond a reasonable doubt because the information provided by the exemplars was so readily available to the Commonwealth. Nadworny had furnished the exemplars upon the pre-trial motion of the Commonwealth over his objection. The exemplars were prepared by Nadworny under the supervision of officials of the Commonwealth. On this record, there is not the slightest suggestion that, had Nadworny's objection to the testimonial aspect of the exemplars been sustained, the Commonwealth would have been unable to provide an eye witness to testify concerning which hand Nadworny had used to prepare the exemplars. Since the Commonwealth clearly would have been able to provide its handwriting expert with the information contained in the exemplars without having had to put them in evidence, their admission, even if erroneous, was harmless beyond a reasonable doubt.

### F. *Lesser Included Offense Instruction*

The Court has reserved the thorniest and most difficult questions until the end of this memorandum. Nadworny's third ground is that he has, and was denied, a federal constitutional due process right to a lesser included offense instruction for both voluntary and involuntary manslaughter. Under Massachusetts law, petitioner has a right to such a charge "where any view of the evidence will permit a finding that the offence is manslaughter and not murder." *Commonwealth v. Le Page*, 352 Mass. 403, 419, 226 N.E.2d 200 (1967). Moreover, to

omit such a required instruction is reversible error. *Commonwealth v. Martinez*, 393 Mass. 612, 473 N.E.2d 167 (1985). The precise issue facing the Court, therefore, is whether any view of the evidence would permit a finding that Nadworny committed either voluntary or involuntary manslaughter instead of murder.[15]

### 1. Voluntary Manslaughter

Nadworny's voluntary manslaughter theory is that the jury could have found that he killed Ms. Belmonte in the heat of passion upon adequate provocation, which could have consisted of a physical and verbal attack by the victim. This argument tracks Massachusetts law, which defines voluntary manslaughter as " 'a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth v. Anderson*, 396 Mass. 306, 313, 486 N.E.2d 19 (1985) (quoting *Commonwealth v. Walden*, 380 Mass. 724, 727, 405 N.E.2d 939 [1980] [citation omitted] ).[16]

However, petitioner neglects to consider that, as the Supreme Judicial Court has already ruled, *Nadworny*, 396 Mass. at 361, 486 N.E.2d 675, there is simply no view of the evidence that would permit a finding that Nadworny killed the victim in the heat of passion upon reasonable provocation and without malice. More specifically, there is absolutely no evidence of any sort that the victim provoked petitioner or that petitioner acted in the heat of passion.[17] Without evidence of reasonable provocation and heat of passion, the trial justice could not properly charge on voluntary manslaughter, *Commonwealth v. Campbell*, 352 Mass. 387, 392, 226 N.E.2d

the content of the exemplars was testimonial or communicative matter." *Id.* at 267, 87 S.Ct. at 1953 (citation omitted).

**15.** As stated above, *supra* note 8, this Court will supplement the Supreme Judicial Court's recitation of the facts with the facts of record brought to the Court's attention by petitioner.

**16.** Nadworny does not argue that he killed the victim in the heat of passion upon sudden com-

bat. *See* Petitioner's Memorandum of Law on the Merits of his Grounds for Granting his Petition for Writ of *Habeas Corpus* at 8, n. 4 (citing Defendant's Brief to the Supreme Judicial Court at 68–69).

**17.** Compare the complete lack of evidence as to voluntary manslaughter with the existence of some evidence as to Nadworny's involuntary manslaughter theory based on battery-unintended death, *infra* pp. 1206–07.

211 (1967) (citations omitted),[18] and this Court, like the Supreme Judicial Court, holds that there is no view of the evidence that would permit a finding that the petitioner committed voluntary manslaughter and thus no occasion to charge on any such theory.

### 2. Involuntary Manslaughter

The petitioner fares a bit better in claiming that he was entitled to an instruction on the lesser included offense of involuntary manslaughter.

#### a. Was the issue raised at trial?

As a threshold matter, there is some doubt in this Court's mind that petitioner ever adequately apprised the trial justice of his desire that a charge be given on an involuntary manslaughter theory. The only remark defense counsel made on the subject at the charge conference was as follows:

> As to involuntary manslaughter, I can't see how the Court, under the present state of Massachusetts law, could give a charge allowing such a verdict. Yet even that may be required in view of the Court's ruling previously made two times on my motions for required findings of not guilty.

Trial Transcript at 14–19 (June 8, 1984). This is hardly an unequivocal request to charge of the nature required in this Court. Fed.R.Crim.P. 30; *United States v. Lopez Andino,* 831 F.2d 1164, 1171 (1st Cir.1987). However, the Supreme Judicial Court chose to address the involuntary manslaughter claim on the merits, *Nadworny,* 396 Mass. at 361, 486 N.E.2d 675, and thus in the absence of any procedural bar to such consideration, this Court can do no less.

#### b. Definitions

■ The Commonwealth of Massachusetts defines involuntary manslaughter in the following manner:

> Involuntary manslaughter is an unlawful homicide, unintentionally caused (1) in the commission of an unlawful act, malum in se, not amounting to a felony or likely to endanger life ... or (2) by an act

which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct.

*Campbell,* 352 Mass. at 397, 226 N.E.2d 211 (1967) (citations omitted). Based on this definition provided by the Supreme Judicial Court, there are three essential elements to the offense: (1) an unlawful homicide, which is (2) unintentionally caused, either (3)(a) in the commission of an unlawful act less serious than a felony, or (3)(b) by wanton or reckless conduct. Thus, this Court must determine whether any view of the evidence in this case would reasonably permit a finding that each of the essential elements of involuntary manslaughter was present. If not, the analysis comes to an end, as is the case with the issue of voluntary manslaughter. *See Supra* p. 1203. If, however, such a finding was reasonably permissible upon all the evidence in the case, then this Court must next consider whether the due process clause of the Fourteenth Amendment requires a charge upon the lesser included offense of involuntary manslaughter.

Concerning the first issue—unlawful homicide—this Court has already ruled that the evidence was sufficient for a jury to find that Ms. Belmonte was unlawfully killed, *See supra* pp. 1197–99, so the issue devolves into a determination whether there was sufficient evidence for a reasonable jury to conclude that the homicide was unintentionally caused either in the commission of a crime less serious than a felony or by wanton or reckless conduct. As to the second issue—unintentional causation—while this Court holds that a rational jury could find that petitioner killed the victim intentionally, *see supra* pp. 1198 –99, the Court also holds that there are several views of the evidence which would rationally permit a finding that petitioner caused the death of the victim *unintentionally.*

First, no testimonial evidence concerning what happened on the night of Ms. Belmonte's disappearance rules out petitioner's unintentionally causing her death. Second, with respect to the physical evi-

---

**18.** This is so, under Massachusetts law, even though, as here, both the prosecution and de- fense requested an instruction on voluntary manslaughter.

dence, the pathologist testified that "the victim's death could have been caused by and was 'consistent with' '[s]uffocation, smothering, injection of different drugs, poisons, carbon monoxide poisoning, drowning, and a large number of chemicals' ". *Nadworny*, 396 Mass. at 359, 486 N.E.2d 675. There was nothing in the pathologist's testimony to preclude the inference that the victim had been killed unintentionally.[19] Third, Nadworny's attempts to conceal the victim's body were as consistent with the guilt and fear that would follow an unintentional killing as a result of unlawful or reckless conduct as they would be after the commission of a murder.[20] Fourth, there is a view of the evidence that, although Nadworny was angry with Ms. Belmonte for "using" him, he was still in love with her at the time of her disappearance. The jury were free to credit this evidence; and, had they done so, the evidence would have tended to negate the contrary inference that Nadworny had intended to do the victim grievous bodily harm and—just barely—would have permitted the inference that, whatever Nadworny had done to Ms. Belmonte, he had not intended to kill her.[21]

### c. Nadworny's four evidentiary theories

The analysis now turns to the third aspect of the definition of involuntary manslaughter, *viz.* whether, if there was an unintentional homicide, it was accomplished by commission of an unlawful act less serious than a felony, or by wanton or reckless conduct. Nadworny advances four separate and distinct theories to satisfy these alternative requirements. He maintains that, considering all the evidence the jury reasonably could have found: (1) petitioner provided or administered drugs to the victim which resulted in her immediate death from a drug overdose, (2) petitioner provided the victim with drugs causing her to overdose and then failed to summon medical assistance, (3) petitioner discovered the victim in a perilous condition in his apartment and, for selfish or untoward reasons, undertook to save her himself rather than summon appropriate aid, and (4) petitioner killed the victim unintentionally in the course of committing a battery against her.[22]

### i. The two drug theories

The first two theories fail for lack of evidence. It is true, as already observed by the Supreme Judicial Court, that there is a view of the evidence that Ms. Belmonte died of a drug overdose.

> "The defendant explained to his friends that [Ms. Belmonte] 'was overdosed' by the hand of another, or 'overdosed' herself."

---

**19.** Compare (as to whether the condition of the victim's body supports the inference that the victim was killed unintentionally) *Commonwealth v. Callahan*, 401 Mass. 627, 632–33, 519 N.E.2d 245 (1988) (three bullets discharged into victim's head does not support inference that killing was unintentional); *Commonwealth v. Walden*, 380 Mass. 724, 730, 405 N.E.2d 939 (1980) (death by ligature around neck could not be unintentional); *Commonwealth v. Santo*, 375 Mass. 299, 306, 376 N.E.2d 866 (1978) (death by ligature around neck and a gag in the mouth accompanied by severe bruises and broken ribs could not be unintentional); *Commonwealth v. Caine*, 366 Mass. 366, 375, 318 N.E.2d 901 (1974) (victim shot four times with gun not supportive of involuntary manslaughter) (citations omitted).

**20.** Of course, detailing these three points of the evidence does not require a trial justice to charge a theory of involuntary manslaughter. These three points of the evidence, standing alone, prove neither intentional nor unintentional homicide. Just as it would take more to permit an inference of murder, *see supra* pp. 1198–99, so too it would take additional evidence supporting involuntary manslaughter before the trial justice could be required to charge on such a theory. *See infra* pp. 1206–07.

**21.** In light of the evidence, no matter how incredible, to the effect that Nadworny's affection for Ms. Belmonte was constant at the time of her death, he was "entitled to an instruction based upon the hypothesis that it is entirely true." *Commonwealth v. Campbell*, 352 Mass. 387, 398, 226 N.E.2d 211 (1967) (quoting *People v. Carmen*, 36 Cal.2d 768, 773, 228 P.2d 281 [1951] [overruled by *People v. Flannel*, 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1 (1979)]).

**22.** Petitioner first articulated these four specific involuntary manslaughter theories in his Petition for Rehearing to the Massachusetts Supreme Judicial Court dated January 8, 1986.

*Nadworny* 396 Mass. at 356, 486 N.E.2d 675; *see also id.* at 350–51, 486 N.E.2d 675 ("The defendant told her that Lisa overdosed, that he tried to stop her."). However, no evidence of any kind exists showing that Nadworny was the one who administered or provided drugs to the victim. While the jury was free to believe or "disbelieve [his proffered] version of the events of that evening," *id.* at 356, 486 N.E.2d 675, there was no version before the jury in which Nadworny caused Ms. Belmonte's death by means of drugs. Therefore, the trial justice was not free to instruct the jury on involuntary manslaughter where, as here, evidence of an essential element of the offense was completely lacking. *Commonwealth v. Vanderpool,* 367 Mass. 743, 746, 328 N.E.2d 833 (1975) (stating general rule that a judge "may not charge on a hypothesis not supported by the evidence") (citations omitted).

ii. The reckless rescue theory

Nadworny's third approach to the record likewise fails for lack of sufficient evidentiary support. According to the Supreme Judicial Court, Nadworny told Debby Lewis, the victim's best friend, that Ms. Belmonte had "overdosed, that she had gone into convulsions, that he tried to stop [23] her, but that if he had called an ambulance and she died, the Belmontes would blame him." *Nadworny,* 396 Mass. at 350–51, 486 N.E.2d 675. Based on this evidence, Nadworny argues that the jury could have found that he discovered Ms. Belmonte on the verge of dying from a drug overdose and that he recklessly tried to save her himself rather than summon medical assistance. Nadworny argues further that killing someone while attempting to aid them by reckless means constitutes involuntary manslaughter, citing *Commonwealth v. Pierce,* 138 Mass. 165 (1884).

■ In *Pierce,* with Mr. Justice Holmes speaking for the court, it was held that a physician who treated a sick woman by causing her "to be kept in flannels saturated in kerosene for three days, more or less, by reason of which she died" could properly be found guilty of involuntary manslaughter. *Id.* at 174, 180.[24] However, this Court need not consider here the issue of the current vitality of the reckless rescue theory of involuntary manslaughter since on this record the mere fact that the jury could have believed that Nadworny tried to "stop" or "save" Ms. Belmonte cannot, without more, support an inference that he acted recklessly. In the commission of a lawful act, there can be no involuntary manslaughter absent reckless conduct in the commission of that act. Accordingly, there is insufficient evidence on this record to require the trial justice to charge involuntary manslaughter on this theory.

iii. The battery-unintended death theory

■ On this record, however, there may exist barely sufficient evidence that Nadworny committed a battery against Ms. Belmonte without intending to kill her.[25]

**23.** As already discussed, *supra* note 9, Debby Lewis actually testified that Nadworny said he "tried to save her." In context, the matter is of no moment, as this Court gives Nadworny the benefit of any doubt as to the witness' meaning and infers that Nadworny's efforts to "stop" or "save" Ms. Belmonte were made after she had overdosed and gone into convulsions.

**24.** In *Commonwealth v. Pierce,* 138 Mass. 165 (1884), the Supreme Judicial Court reasoned that:

for a long time it has been ... fully, and latterly, we may add, much more willingly, recognized that a man may commit ... manslaughter by doing otherwise lawful acts recklessly....

If a physician is not less liable for reckless conduct than other people, it is clear, in the light of ... the later Massachusetts cases, that the recklessness of the criminal no less than that of the civil law must be tested by what we have called an external standard....

When the jury are asked whether a stick of a certain size was a deadly weapon, they are not asked further whether the defendant knew that it was so. It is enough that he used and saw it such as it was. So as to an assault and battery by the use of excessive force. So here.

*Id.* at 175, 177–78, 180 (citations omitted).

**25.** A battery which results in the unintended death of the battered person is involuntary manslaughter, *Commonwealth v. Campbell,* 352 Mass. 387, 397, 226 N.E.2d 211 (1967) (citation omitted), because the Commonwealth of Massachusetts classifies battery as a misdemeanor,

Indeed, Nadworny could not have murdered the victim without also committing a battery against her.[26] Accordingly, the evidence which permits a finding that Nadworny committed second degree murder is the same evidence which permits a finding that he committed a battery, except that a jury would have to find that Nadworny caused the death of the victim unintentionally in order to convict him of involuntary manslaughter. Here, though the evidence to support such a conclusion is gossamer thin, in the considered judgment of this Court, the evidence may be sufficient under Massachusetts law to warrant and require an involuntary manslaughter charge on a theory of battery-unintended death. The crucial evidence on this point is the testimony of Debby Lewis to the effect that Nadworny claimed that at all relevant times he "loved" Ms. Belmonte. *Nadworny*, 396 Mass. at 346, 486 N.E.2d 675. In the judgment of this Court, the jury were free to credit his claim of continued affection, and—had they done so—in the particular circumstances of this case where the cause of death was unknown, they could reasonably infer that any battery he may have committed against her was not intended to kill her.

At this point in the analysis, one must pause to reflect—even if this United States District Court were to consider the evidence on the theory of battery-unintended death sufficient, albeit barely, as matter of Massachusetts law, to require a charge on battery-unintended death, what of that? Clearly, neither the distinguished trial justice of the Massachusetts Superior Court nor the full bench of the Massachusetts Supreme Judicial Court, the final word on matters of state law, considered the evidence sufficient. *Nadworny*, 396 Mass. 342, 361, 486 N.E.2d 675 (1985). So here

the analysis ends—unless 1) there exists a federal constitutional due process right to a charge on the lesser included offense of involuntary manslaughter, and 2) that right is applied to these 1984 trial proceedings. The Court turns to these issues.

### d. A due process right to a lesser included offense charge?

While the Supreme Court has held that a state court's failure to give a lesser included offense instruction in a capital case may amount to a due process violation that is cognizable on habeas corpus, *Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980); *Bell v. Watkins*, 692 F.2d 999, 1004 (5th Cir.1982), *cert. denied, Bell v. Thigpen*, 464 U.S. 843, 104 S.Ct. 142, 78 L.Ed.2d 134 (1983), it has consistently declined to consider whether non-capital defendants such as Nadworny have the same right. *See Holloway v. Florida*, 362 So.2d 333 (Fla.Dist.Ct.App. 1978), *cert. denied*, 449 U.S. 905, 101 S.Ct. 281, 66 L.Ed.2d 137 (1980); *see also Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Similarly, in the First Circuit, whether a state court's failure to give a lesser included offense instruction in a non-capital case is cognizable on habeas corpus appears unresolved. *See Lewinski v. Ristaino*, 448 F.Supp. 690, 697 (D.Mass.1978) (Tauro, J.) ("There is considerable question whether relief by way of habeas corpus will properly lie for denial of a requested jury charge as to alleged criminal activity.") (footnote omitted).

There is significant, persuasive support for imposing a federal due process right to a lesser included offense instruction in the particular circumstances of this case, however. True, *Beck v. Alabama* must be read as providing an extra measure of due process protection for those facing execu-

---

which is a less serious offense than a felony. Mass.Gen.Laws Ann. ch. 265, sec. 13A (West 1970).

**26.** "'An assault and battery is the intentional and unjustified use of force upon the person of another, however slight....'" *Campbell*, 352 Mass. at 387, 226 N.E.2d 211 (citations omitted). Moreover, in order to have killed the victim with malice aforethought, a defendant "must

have intended 'to do an act creating a plain and strong likelihood that death or grievous harm [would] follow.'" *Commonwealth v. Estremera*, 383 Mass. 382, 395, 419 N.E.2d 835 (1981) (quoting *Commonwealth v. Huot*, 380 Mass. 403, 408, 403 N.E.2d 411 [1980] [overruled on other grounds by *Commonwealth v. Bray*, 407 Mass. 296, 553 N.E.2d 538 (1990) ]).

tion—the state's most punitive sanction.[27] Even so, holding that due process requires a lesser included offense instruction in non-capital cases is consistent with *Beck*'s central principle that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard." *Beck*, 447 U.S. at 634, 100 S.Ct. at 2388 (citing *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 [1973]). The *Beck* court, in explaining its holding, focused on the problem that concerns this Court in the instant case:

> That safeguard [of a lesser included offense instruction] would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitable to enhance the risk of an unwarranted conviction.

*Beck*, 447 U.S. at 637, 100 S.Ct. at 2389. At Nadworny's trial, the jury knew that Ms. Belmonte was dead and could readily infer both that she had met her death in Nadworny's apartment and that her body had been found in the trunk of his car. Therefore, as a practical matter, the jurors would suspect that Nadworny had something to do with Ms. Belmonte's death.

By instructing the jury only as to first and second degree murder, however, the justice of the Superior Court forced the jurors to choose between either convicting Nadworny of murder despite the uncertainty of the manner of Ms. Belmonte's death or acquitting Nadworny despite the suspicions of the jurors themselves. A lesser included offense instruction, had one been given, would have resolved this inevitable tension by allowing the jurors the option of convicting Nadworny for a lesser offense if they had been unable to find each of the elements of murder beyond a reasonable doubt. In this way, a lesser included offense instruction protects a defendant's due process right to the reasonable doubt standard and reduces the risk of an unwarranted conviction.

Indeed, it appears to this Court that the First Circuit has implicitly recognized a due process right to a lesser included offense instruction in this very case. In remanding to this Court, *Nadworny v. Fair*, 872 F.2d 1093 (1st Cir.1989), the First Circuit stated that:

> the essence of the [lesser included offense] claim—that reasonable doubt exists as to guilt on the crime charged—is a matter of fundamental due process, *see In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072 [25 L.Ed.2d 368] (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 697–98, 95 S.Ct. 1881, 1888–89 [44 L.Ed.2d 508] (1975), and therefore cognizable in a federal habeas proceeding.

*Id.* at 1102–03. *See Look v. Amaral*, 725 F.2d 4 (1st Cir.1984) (holding that due process does not require a lesser included offense instruction of manslaughter where not requested).

Additionally, circuits other than the First Circuit have ruled clearly that federal due process requires a lesser included offense instruction in non-capital cases. *Prather v. Rees*, 822 F.2d 1418 (6th Cir.1987) (If habeas petitioner was entitled to a lesser included offense instruction under state law, state trial court violated petitioner's rights in refusing to give it, and habeas writ should issue); *Ferrazza v. Mintzes*, 735 F.2d 967, 968 (6th Cir.1984) (The *Beck*

---

**27.** In finding a due process right to a lesser included offense instruction in capital cases, the Supreme Court relied in part on the fact that "there is a significant constitutional difference between the death penalty and lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980). The *Beck* court pointed out that because the death penalty is a qualitatively different punish-ment than any other punishment, it had "invalidated procedural rules that tended to diminish the reliability of the sentencing determination." *Id.* at 638, 100 S.Ct. at 2390 (footnote omitted). Still, it is entirely consistent with *Beck* to hold that non-capital defendants have a federal constitutional due process right to a lesser included offense instruction when the evidence warrants one.

"principle is not limited to capital cases...."); *see also United States v. Zapata-Tamallo,* 833 F.2d 25, 28 (2d Cir. 1987) ("Due process requires that a lesser included offense instruction be given [in narcotics possession case] if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.") (quoting *Hopper v. Evans,* 456 U.S. 605, 612, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 [1982]); *Bishop v. Mazurkiewicz,* 634 F.2d 724 (3d Cir. 1980), *cert. denied,* 452 U.S. 917, 101 S.Ct. 3053, 69 L.Ed.2d 421 (1981) (Lesser included offense instruction of manslaughter is not required by due process if the evidence does not support it.). *But see Easter v. Estelle,* 609 F.2d 756, 758 (5th Cir.1980) (holding that "a state trial court judge's failure to instruct on a lesser included offense is not a federal constitutional matter") (citations omitted); *Nichols v. Gagnon,* 710 F.2d 1267, 1269–72 (7th Cir.1983); *Cooper v. Campbell,* 597 F.2d 628, 631 (8th Cir.1979), *cert. denied,* 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979); *James v. Reese,* 546 F.2d 325, 327 (9th Cir.1976, *cert. denied sub nom., Davis v. Greer,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1983); *Perry v. Smith,* 810 F.2d 1078, 1080 (11th Cir.1987).

Finally, there exists within the First Circuit a prescient and most persuasive district court decision precisely on point. In *Dukette v. Perrin,* 564 F.Supp. 1530 (D.N.H.1983), Chief Judge Devine was faced with a virtually identical situation in a non-capital case. He applied *Beck* to a state court's failure to give an instruction on simple assault as a lesser included offense of aggravated felonious sexual assault. Recognizing that the Supreme Court had held that the "enhance[d] ... risk of unwarranted conviction" caused by a court's failure to give a lesser included offense instruction was "intolerable in a case where the defendant's life was at stake," *Dukette,* 564 F.Supp. at 1538, the Chief Judge concluded that:

[t]he risk is equally intolerable in this case. Jury instructions which inevitably enhance the risk of unwarranted convictions have never been tolerated in our

system of jurisprudence.... The fact that defendants in capital cases are afforded additional constitutional protections in no way diminishes the importance of the fundamental constitutional rights accorded all defendants in criminal cases.

*Id.* at 1538–39.

Accordingly, upon this review of the present state of the law, this Court would be prepared to hold that Nadworny, convicted of second degree murder and sentenced to life imprisonment, has a due process right to a lesser included offense instruction on involuntary manslaughter on the theory of battery-unintended death—if such a holding would make a difference in this case.

### e. Retroactive application?

Upon the most careful reflection, however, this Court concludes that, even were it to rule 1) that there exists a federal constitutional due process right to receive a lesser included offense charge where warranted under state law, and 2) that such a charge was required in this case but was not given—it nevertheless avails Nadworny nothing, since the application of any such rule to this case is the federal imposition of a "new" rule to a state case in which the judgment has become final pursuant to state judicial procedures. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). One commentator asserts the following:

Since 1965, courts and legal scholars have understood the "retroactivity" of newly created constitutional rules of criminal procedure to be governed by the standard established that year in *Linkletter v. Walker.* 381 U.S. 618[, 85 S.Ct. 1731, 14 L.Ed.2d 601] (1965); *see, e.g., Allen v. Hardy,* 478 U.S. 255, 258[, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199] (1986) (per curiam); Beytagh, *Ten Years of Non–Retroactivity: A Critique and a Proposal,* 61 Va.L.Rev. 1557, 1559 & n. 14 (1975). Under this standard, a newly announced constitutional rule would not benefit habeas corpus petitioners whose convictions had become final before the

date of the Court's decision if the purpose of the new rule, the reliance of the states on the old rule, and the effect on the administration of justice of the new rule's retroactive application militated against unsettling previously decided cases. *See Stovall v. Denno,* 388 U.S. 293, 297[, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199] (1967).... [I]n *Teague v. Lane,* [489 U.S. 288,] 109 S.Ct. 1060 [103 L.Ed.2d 334] (1989) (plurality opinion), the Court supplanted the retroactivity standard of *Linkletter* with a standard adapted from Justice Harlan's separate opinions in two of *Linkletter's* better known progeny. *See Mackey v. United States,* 401 U.S. 667, 675[, 91 S.Ct. 1160, 1164, 28 L.Ed.2d 404] (1971) (Harlan, J., concurring in part and dissenting in part); *Desist v. United States,* 394 U.S. 244, 256[, 89 S.Ct. 1030, 1037, 22 L.Ed.2d 248] (1969) (Harlan, J., dissenting). The *Teague* standard dramatically reduces, with two narrow exceptions, the retroactive application of new rules to cases on collateral review.

*The Supreme Court—Leading Cases,* 103 Harv.L.Rev. 137, 290 (1989). The *Teague* Court held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague,* 109 S.Ct. at 1075 (1989); *Butler v. McKellar,* —— U.S. ——, 110 S.Ct. 1212, 1214, 108 L.Ed.2d 347 (1990) ("[A] new decision generally is not applicable in cases on collateral review unless the decision was dictated by precedent existing at the time the petitioner's conviction became final."); *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989) ("Under *Teague,* new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions.") (citations omitted).

The judgment of conviction in the present case became final, at the latest, on June 23, 1986, when the Supreme Court denied Nadworny's petition for a writ of certiorari. Moreover, were this Court to announce that the due process clause of the federal constitution requires a lesser included offense instruction in a non-capital case, it would be declaring a "new" constitutional rule of criminal procedure. "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal government.... [A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 109 S.Ct. at 1070 (citations omitted).[28] Thus, the general rule of nonretroactivity applied to "new" rules to protect earlier convictions against collateral attack applies to this case—unless Nadworny's claim falls "into either of two narrow exceptions." *Supreme Court—Leading Cases, supra,* at 292. *See* E. Krieger, *The Court Declines in Fairness—Teague v. Lane,* 109 S.Ct. 1060 (1989), 25 Harv. C.R.–C.L. L.Rev. 164, 172 (1990).

As was the case in *Teague,* so it is here. The first exception suggested by Justice Harlan—that "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,' *Mackey,* [*v. United States*], 401 U.S. [675] at 692 [91 S.Ct. 1171, 1179, 28 L.Ed.2d 388 (1971)] (separate opinion of Harlan, J.)—is not relevant here." *Teague,* 109 S.Ct. at 1073. Application of a constitutional due process requirement that a lesser included offense instruction be given when warranted under state law would not accord constitutional protection to any primary activity whatsoever.

The second narrow exception which permits retroactive application of a "new" rule such as the one at issue in this case is

---

**28.** Indeed, the expansive concept of what constitutes a "new" rule found in the opinion of Chief Justice Rehnquist for the Court in *Butler v. McKellar,* —— U.S. ——, 110 S.Ct. 1212, 1216–18, 108 L.Ed.2d 347 (1990), has caused Mr. Justice Brennan to complain that "[a] legal ruling sought by a federal habeas petitioner is now deemed 'new' as long as the correctness of the rule, based on precedent existing when the petitioner's conviction became final, is 'susceptible to debate among reasonable minds.' " *Id.* at 1219 (quoting *Butler,* 110 S.Ct. at 1217) (Brennan, J., dissenting).

limited in scope "to those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 1076–77. It is a much closer question, of course, whether Nadworny's situation comes within this exception, thus enabling him to take advantage of the retroactive application of a new rule of constitutional criminal procedure—should one be declared—requiring as matter of due process the giving of a lesser included offense instruction where warranted by state law. For three reasons, however, this Court, after careful reflection, concludes that the second exception to the general rule of non-retroactivity likewise does not apply to this case.

First, while the failure to give a lesser included offense instruction may well be said to affect the "likelihood of an accurate conviction" in that it heightens the potential for conviction of a major offense rather than the lesser included offense, *see Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980), Mr. Justice Stevens' concurrence makes clear that the reference of the plurality to "an accurate conviction" refers not to the precise crime of which a defendant is found guilty but rather to "an accurate determination of innocence or guilt." *Teague*, 109 S.Ct. at 1081 (Stevens, J., concurring in part and concurring in the judgment) (quoting *Teague*, 109 S.Ct. at 1076 [plurality opinion]). The failure to give a lesser included of-

fense instruction has no material bearing on the issue of innocence or guilt; rather, it bears, perhaps significantly, on the crime for which a defendant is found guilty.[29] It appears, therefore, that the Supreme Court plurality does not intend the second narrow exception to apply to the circumstances presented in this case.[30]

Such an interpretation is supported by considering the premise on which the plurality based its consideration of this second narrow exception, *viz,* "[b]ecause we operate from the premise that such [new] procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge." *Id.* at 1077. Since the *Beck* decision by its carefully crafted terms only applies in death penalty cases, it seems unlikely—even should the premise of that decision be extended, *see supra* pp. 1207–09—that the Supreme Court will come to consider it to be one of the newly emergent "components of basic due process." *Teague*, 109 S.Ct. at 1077.

Finally, it must be remembered that, as a practical matter under Massachusetts law, Nadworny is eligible for parole from his second degree murder conviction after serving fifteen years thereon. Mass.Gen. Laws Ann. ch. 127, sec. 133A (West 1974). Had a lesser included offense charge been given, and had Nadworny been convicted of

29. It can be argued, of course, that there is no principled distinction between the issue of whether a habeas petitioner is factually innocent and the issue of whether a criminal defendant has been convicted of an offense more serious than the offense for which he might have been convicted if his trial had met the requirements of due process. *See Teague v. Lane*, 109 S.Ct. 1060, 1081 (Steven, J., concurring) ("[F]actual innocence is too capricious a factor by which to determine if a procedural change is sufficiently 'bedrock' or 'watershed' to justify application of the fundamental fairness exception.") (citations omitted).

While the possibility of changing a habeas petitioner's conviction from murder to manslaughter does not have the real-world significance of changing a conviction to an acquittal, the *Teague* plurality itself ruled that "[w]e have declined to make the application of the procedural default rule dependent on the magnitude of the constitutional claim at issue ... or on the

State's interest in the enforcement of its procedural rule...."). *Teague*, 109 S.Ct. at 1074 (citations omitted). This Court further notes that the *Teague* court did not have to consider the accuracy of petitioner's criminal conviction in the sense it is presented to this Court, because that issue was not before the Supreme Court in *Teague.* While this observation makes predicting the reach of the *Teague–Penry– Butler* bar more difficult, it does not relieve this Court of the duty of decision in this case.

30. Indeed, one commentator has gone so far as to conclude that "[A]ny constitutional violation less serious than that presented in *Gideon* [*v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)] will probably not be an exception to the *Teague* bar." E. Krieger, *The Court Declines in Fairness—Teague v. Lane*, 109 S.Ct. 1060 (1989), 25 Harv.C.R.–C.L. L.Rev. 164, 172 n. 57 (1990).

involuntary manslaughter, he would be subject to a maximum sentence of twenty years. Mass.Gen.Laws Ann. ch. 265, sec. 13 (West 1974). Under the Sentencing Guidelines of the Massachusetts Superior Court, the probable sentence for involuntary manslaughter would be not less than eighteen nor more than twenty years imprisonment in the Massachusetts Correctional Institution at Cedar Junction. Had such a sentence been imposed on Nadworny, he would be eligible for parole after serving twelve years. Mass.Gen.Laws Ann. ch. 127, sec. 133 (West Supp.1979). It cannot be assumed that Nadworny will be paroled as soon as he becomes eligible. However, it is significant that, even had a lesser included offense charge been given, no one suggests, as a practical matter, that Nadworny would today be free from custody. Indeed, to the contrary, the overwhelming likelihood is that he would be facing a substantial period of imprisonment whether or not a charge on involuntary manslaughter had been given. Therefore, as the sanctions for criminal conduct are a matter especially within a state's province, e.g., *Gregg v. Georgia,* 428 U.S. 153, 176, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976), this seems a strange case for the issuance of the Great Writ even were it not complicated by the retroactivity issue.[31]

Here, where the giving or withholding of a lesser included offense charge has no material bearing on the issue of innocence or guilt, where the Supreme Court has not yet itself expanded the *Beck* principle beyond death penalty cases, and where even a ruling favorable to Nadworny on this point will not, as a practical matter, have any immediate effect on his custodial status for

years to come, this Court concludes that *Teague* precludes the retroactive application to Nadworny of any rule of constitutional criminal procedure requiring a lesser included offense charge, even were this Court to announce such a rule. Accordingly, Nadworny's petition must be denied.

### f. Summary and reflections

Candor compels a brief reflective summary of the necessarily intricate reasoning the Court has been required to employ herein.[32]

It is apparent to this Court that the theory of manslaughter through battery-unintended death was never adequately raised at trial so as to warrant consideration by the trial justice. The late John Jennings, Esq., one of the Commonwealth's finest trial lawyers and an expert in criminal defense work, represented Nadworny at trial. The Hon. Robert Barton, an extraordinarily distinguished justice of the Massachusetts Superior Court, likewise an expert in the adjudication of criminal cases, presided over the trial. Nevertheless, the only reference to involuntary manslaughter in the charge conference is the equivocal statement of counsel quoted *supra* at 1204, and no specific objection raising the battery-unintended death theory was made to the charge as given. Were the procedural issue of waiver presented to this Court, it would seem that the trial justice, the one judicial officer who "lived in the trenches," *Anderson v. Beatrice Foods Co.,* 900 F.2d 388, 393 (1st Cir.1990) (quoting *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1082 [1st Cir.1989]), with this case,

---

31. A habeas court may condition its grant of the writ in order to provide the state with the option of resentencing the habeas petitioner instead of retrying him. *Cabana v. Bullock,* 474 U.S. 376, 392, 106 S.Ct. 689, 700, 88 L.Ed.2d 704 (1986); *Songer v. Wainwright,* 769 F.2d 1488 (11th Cir.1985), *cert. denied sub nom., Dugger v. Songer,* 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987); *United States ex rel. Mota v. Fairman,* 624 F.Supp. 789 (N.D.Ill.1985).

32. In a brilliant essay building on his 1989 Cardozo Lecture to the Association of the Bar of the City of New York, Professor Laurence Tribe argues that "[e]ach legal decision restructures

the law itself, as well as the social setting in which law operates, because, like all human activity, the law is inevitably embroiled in the dialectical process whereby society is constantly recreating itself." L. Tribe, *The Curvature of Constitutional Space: What Lawyers Can Learn From Modern Physics,* 103 Harv.L.Rev. 1, 8 (1989). This case—requiring as it does an analysis of the interplay of the legal rulings of trial and appellate courts in both the state and federal judicial systems—is, at least in microcosm, an exemplar of Professor Tribe's observation.

never had a viable chance to confront what has come to be the crucial issue herein.

Be that as it may, the procedural issue of waiver is *not* before this Court. *Cf. Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Despite the evident failure to brief and articulate the theory of procedural default now advanced before the Massachusetts Supreme Judicial Court, that Court is acting in accordance with its tradition of plenary review on the merits, especially in murder cases. *See* Mass.Gen. Laws Ann. ch. 278, sec. 33E (1981). Here, the Court briefly addressed on the merits— and rejected—Nadworny's appellate claim that he was entitled to a charge on the lesser included offense of involuntary manslaughter. The battery-unintended death theory of involuntary manslaughter was first articulated in Nadworny's petition for rehearing. Not surprisingly, it was rejected out of hand.

With the Massachusetts Supreme Judicial Court having eschewed the procedural default as a ground (or a defense) for its decision, the matter comes before this Court on Nadworny's habeas petition. After a false start wherein this Court misconceived the legal standard for exhaustion of state remedies, *Nadworny v. Fair*, 685 F.Supp. 20 (D.Mass.1988), *rev'd*, 872 F.2d 1093 (1st Cir.1989), the matter was remanded and this Court addressed the merits.

After a most careful sifting of the increasingly cold record, this Court uncovered a single shard of evidence—Nadworny's professed "love" for the victim— which, in the unique circumstances of this case, would seem to warrant and require, under the law of the Commonwealth, a charge on the lesser included offense of involuntary manslaughter by means of a battery causing unintended death. This Court approaches such a conclusion with a great deal of diffidence to the thorough and carefully crafted opinion of the Massachusetts Supreme Judicial Court which, on this very point, concluded—contrary to what seems to be the standard expressed in *Campbell*, 352 Mass. at 398, 226 N.E.2d 211—that the evidence at trial was insufficient to require the delivery of a lesser included offense charge on the issue of involuntary manslaughter. *Nadworny*, 396 Mass. at 361, 486 N.E.2d 675. The Massachusetts Supreme Judicial Court is the last word on state law, but the sufficiency of evidence implicates constitutional concerns, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Therefore, this Court necessarily addressed the mirror image of the issue as it is usually presented, *viz.* even if there is sufficient evidence to convict of murder, is there also sufficient evidence to convict of a different, albeit lesser, offense?

Resolution of this issue in Nadworny's favor, however, raises yet another issue— is there a federal due process right to a charge as to a lesser offense? Absent such a right, the existence of sufficient evidence *vel non* to support the lesser charge is meaningless in the habeas context. Nevertheless, review of the developing case law convinced this Court that such a right likely will be recognized on direct review.

But what of it? Recognizing that any such due process requirement would be a "new rule" under *Teague v. Lane*, this Court considered whether any exception to the *Teague* rule applied and, though conceding that the question is an extraordinarily close one, concluded that no exception applied, thus bringing the analysis to an end.[33] Accordingly, this Court expresses no opinion concerning whether, in fact,

---

**33.** Here, the Court frankly acknowledges one of the central difficulties in applying the *Teague* bar, and recognizes that the plurality in *Teague* held that "[r]etroactivity is properly treated as a threshold question.... Thus, [before announcing any new rule, this Court] should ask whether such a rule would be applied retroactively to the case at issue." *Teague*, 109 S.Ct. at 1069–70. Accordingly, one could well question whether this Court should have embarked at all upon a consideration of a.) whether there was sufficient evidence to warrant a charge as to a lesser offense and, if so, b.) whether the due process clause requires that such a charge be given. Perhaps it would have been better—certainly this opinion would have been shorter—had the *Teague* bar been invoked without any reference to the manner in which the bar applied to the circumstances of this specific case.

There are, however, at least two intractable problems created by such a truncated analysis.

sufficient evidence exists to warrant and require a charge as to the lesser offense of manslaughter[34] and, if there is, whether the due process clause of the federal constitution requires such a charge to be given.

First, as Mr. Justice Stevens recognized in *Teague* itself, "[b]y declaring retroactivity to be the 'threshold question,' ... the plurality inverts the proper order of adjudication. Among other things, until a rule is set forth, it would be extremely difficult to evaluate whether the rule is 'new' at all." *Teague,* 109 S.Ct. at 1079 n. 2 (Stevens, J., concurring in part and concurring in the judgment) (citations omitted). Mr. Justice Stevens returned to the point in *Penry v. Lynaugh,* — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), arguing that "[i]t is neither logical nor prudent to consider a rule's retroactive application before the rule itself is articulated. Nor am I at all sure that courts should decide the retroactivity issue if it was not raised." Indeed, one commentator has concluded flatly that, "[i]t seems impossible to judge whether the remedy requested would create a new constitutional rule if a *Teague* threshold test is applied *before* the court can address the substantive issues of the case." E. Krieger, *The Court Declines in Fairness—Teague v. Lane,* 109 S.Ct. 1060 (1989), 25 Harv.C.R.–C.L. L.Rev. 164, 176 n. 77 (1990).

Second, at least at the District Court level, the *Teague* threshold will come into play only when, but for *Teague,* the District Court is prepared to declare a "new" constitutional rule of criminal procedure. This somewhat mysterious, one-sided application of the *Teague* threshold occurs, since, as Mr. Justice Stevens observes acutely, "[i]f [the rule at issue] is not ['new'], of course, no retroactivity question arises." *Teague,* 109 S.Ct. at 1079 n. 2 (Stevens, J. concurring in part and concurring in the judgment). That is, unless declaration of a "new" constitutional rule of criminal procedure is contemplated by the District Court, there is no occasion to consider the application of *Teague* at all, and the Court will simply apply extant law on the merits as the ground for denying the habeas petition. It is only when declaration of a "new" rule is in the offing that the application of *Teague* must be considered. In that event, the district judge has two choices. Either she can obscure the contours of the extant constitutional rules of criminal procedure, necessarily hinting at but avoiding principled declaration of the state of the law, *see Zant v. Moore,* 489 U.S. 836, 109 S.Ct. 1518, 1519, 103 L.Ed.2d 922 (1989) (Blackmun, J., dissenting), or, as the Court has done here, she can explicate her reasoning but, to be faithful to the *Teague* threshold, water it down with weasel words such as "it would seem likely," "probable," and others. Thus, one avoids any positive declaration of the legal standard yet, nonetheless, limits the reasoning sufficiently to permit adequate and thorough appellate review.

## III. CONCLUSION AND FURTHER PROCEEDINGS

For the reasons expressed above, none of Nadworny's claims appear to require *habeas corpus* relief. Before judgment enters,

The first choice runs the risk of reducing certain habeas petitions to Kafkaesque proceedings in which the petitioner loses but never knows why. Citing *Zant,* commentators have argued that "the [Supreme] Court will make convenient use of the threshold test to deny habeas petitions without highlighting precisely what 'new' constitutional rule it is declining to reach." *The Supreme Court—Leading Cases,* 103 Harv.L.Rev. 137, 299 n. 69 (1989). The second raises the spectre of rendering advisory opinions, *Teague,* 109 S.Ct. at 1078 (O'Connor, J.) (plurality opinion), a species of unreviewable shadow law which is particularly suspect at the District Court level because, so long as the District Court applies the *Teague* threshold accurately, the substantive issue will never be addressed by appellate tribunals until the issue is presented on direct review. Of the two, this Court considers itself compelled to choose the latter so as to afford the parties a principled adjudication. *See* L. Tribe, *The Curvature of Constitutional Space: What Lawyers Can Learn From Modern Physics,* 103 Harv.L.Rev. 1, 8 (1989).

There exists a third choice, of course. One may argue that District Courts have no business declaring "new" constitutional rules of criminal procedure at all, and such matters ought be left to appellate tribunals, where, upon the record established below, the *Teague* threshold is somewhat more workable. This cannot be the law, however. It is the duty of every judicial officer, consistent with her oath, faithfully to declare the meaning of the Constitution. True, under the principles of *stare decisis,* a district court judge is strictly bound by the decisions of the Supreme Court and the relevant circuit court of appeals, but this hardly means that constitutional interpretation is static. When addressing issues not controlled by precedent, the duty of a district court judge to interpret the Constitution is coextensive with that of a Supreme Court justice.

34. One of the minor ironies of this case is the fact that the Massachusetts Supreme Judicial Court, which in many other contexts has extended particularized rules of constitutional criminal procedure beyond what is required by the United States Constitution, *see* Wilkins, *Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution,* 14 Suffolk U.L.Rev. 887, 888 (1980), without dissent or demur, recently adopted the *Teague* standard for consideration of issues on collateral review. *Commonwealth v. Bray,* 407 Mass. 296, 298–301, 553 N.E.2d 538 (1990).

however, one matter may require further consideration. *Teague*, decided February 22, 1989, and its progeny, *Penry v. Lynaugh*, — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and *Butler v. McKellar*, — U.S. —, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990) are relatively recent decisions and neither party has addressed their import either in their briefs or at oral argument. In view of the complexity [35] and importance of this matter, fairness requires this Court to follow the procedure adopted in *Shawmut Worcester County Bank v. First American Bank & Trust*, 731 F.Supp. 57, 64 (D.Mass.1990), and give the parties an opportunity to brief the application of the *Teague* rule to the circumstances of this case. Accordingly, Nadworny shall have thirty days from the date of this memorandum to address the issues raised in Part II.F.2.e. herein, and the Commonwealth shall have twenty days thereafter to reply. Should no briefs be received, the Court will enter judgment for the respondent Commissioner. Should Nadworny brief the retroactivity issue, however, the Court will reconsider that point.

SO ORDERED.

---

**35.** Indeed, so sweeping is the departure of *Teague* and its progeny from prior jurisprudence that the Federal Courts Study Committee initially recommended that Congress enact legislation to regularize the retroactive application of "new" rules and recognize three exceptions to the general rule of nonretroactivity rather than *Teague*'s two exceptions. Federal Courts Study Committee, Tentative Recommendations for Public Comment, 57–59, December 22, 1989. While these tentative recommendations were omitted from the final draft, they indicate the importance of the issues raised and suggest that these matters are far from settled.